(No. 12278.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EARL DEAR, Plaintiff in Error.

*Opinion filed December 18, 1918.*

1. CRIMINAL LAW—*discrepancy as to middle initial of a grand juror is of no importance.* In law the middle initial is no part of a name, and the fact that the list of grand jurors summoned contains the name of Walter J. Raymer whereas the foreman appointed by the court and whose name as indorsed on the indictment is Walter H. Raymer is of no legal importance.

2. SAME—*what sufficiently shows that foreman of grand jury was sworn.* A record reciting that, the panel of grand jurors being filled, the court appointed one of their number (naming him) as foreman and that the grand jurors were duly sworn and charged by the court sufficiently shows that the foreman was sworn, as the recital that the grand jurors were duly sworn authorizes the presumption that they were sworn in accordance with the law, the foreman first and then the others.

3. SAME—*when refusal to grant a further continuance is not ground for reversal.* Refusal to grant a further continuance of a criminal case is not ground for reversal where the affidavits make no showing requiring a further continuance and it appears from the whole record that no prejudice to the defendant resulted from such refusal.

4. SAME—*when refusal of instructions is proper.* It is proper to refuse instructions which are argumentative in form or which merely repeat, in varying language, principles of law announced in other instructions which were given.

5. SAME—*when instructions as to circumstantial evidence are inapplicable.* Instructions stating the principles of law which apply where a conviction is sought upon circumstantial evidence have no application and are properly refused where the testimony in the case is direct.

6. SAME—*what is within proper scope of the State's attorney's argument.* It is proper for the State's attorney, in his argument to the jury, to denounce the defendant as guilty of the crime charged and a witness as guilty of perjury, where an inference of such guilt may be fairly deduced from the facts and circumstances shown by the evidence.

7. SAME—*when failure to find age of defendant is harmless.* The provision of the Parole act, as amended in 1917, requiring

the jury in all cases to find the age of the defendant, is to enable the court to fix the place of imprisonment under the classification made by the act, and no necessity exists for finding the age of a defendant who is found guilty of murder and given the death penalty.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

CHARLES C. WILLIAMS, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, JAMES C. O'BRIEN, and JOHN PRYSTALSKI, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Earl Dear was convicted of murder and sentenced to death and has sued out a writ of error. Eugene Hartnett was indicted jointly and tried with him. He was convicted and sentenced to imprisonment in the penitentiary for fourteen years.

On the evening of January 18, 1918, Harold P. Tucker, a private in the Canadian army, his brother, Archibald W. Tucker, the latter's wife and Miss Barbara Lessner spent the evening together in the city of Chicago. They left the Alps cafe about eleven o'clock and went to Ward & Larose's saloon, at the southwest corner of North avenue and LaSalle street, where they remained until about one o'clock, when they were joined by Rudolph Wolf, a chauffeur. Archibald W. Tucker left soon afterward, and in a few minutes the party went up-stairs to a Chinese restaurant. While they were waiting to be served Wolf looked out of the window and then ran down-stairs. Tucker, after looking out the window and seeing a man sitting in Wolf's car trying to start it and another leaning on the door on the south side of the car, (the side next the sidewalk,) followed Wolf down-stairs. In the meantime the man at the side of the

car said to the man in the car, "Hurry up! Give her more juice!" Wolf came from the entrance to the restaurant, went around in front of the car, and said, "What are you doing to this machine?" The man at the wheel then got out of the car, which was left-hand drive and facing east, on the north side, came around in front, and said, "What is it of your business?" Wolf pushed him, saying, "I will make it my business," and then, just as Tucker came through the door, ten or twelve feet away, the man shot Wolf with a revolver through the body. Both men then ran south on LaSalle street and Tucker remained to take care of Wolf, whom he put in the car and drove to the Henrotin Hospital, where Wolf died from the effects of the wound in the afternoon of that day. The two men, immediately after the shooting, ran south on the west side of LaSalle street. Snow had been shoveled off the sidewalks and was piled up on each side of the street four or five feet high. In a short distance the two men running met two police officers, one of whom grappled with and threw or knocked down one of them. The other officer followed, overtook and arrested the other man. The men arrested were the plaintiff in error and his co-defendant, Hartnett. The officer who arrested the plaintiff in error produced on the trial a revolver which he testified that he took from plaintiff in error, who had it in his hand when he met the officers. It contained four loaded shells and one empty shell.

Both the defendants testified in their own behalf, and after giving an account of their actions in the afternoon of January 18, during which they were at various places and drank various intoxicating drinks, stated that just before the shooting they were coming north on the west side of LaSalle street and tried the side door of Ward & LaRose's saloon but could not get in, whereupon they separated, Hartnett walking south on LaSalle street and the plaintiff in error going north. The plaintiff in error testified that he had just turned the corner of North avenue when he heard a

shot fired, and on looking saw a car, with a man standing on the running-board, wearing a cap, and another standing in the street. He did not see the man that was shot, but on the moment the impulse came to him, as he was just out of jail, and he started to run south on LaSalle street. One of the men started to run, and he did not see the man with the cap after that. As the plaintiff in error started to run he saw Hartnett. The plaintiff in error had only gone a little way when an officer seized him and knocked him down. He did not have any revolver, and the first time he saw the revolver which the officer said he took from him was when the officer had it after he knocked him down. Hartnett testified that after he said good-night to the plaintiff in error he walked south and hearing the report of a pistol shot turned around and looked north. He saw an officer running south and asked him what he was running for, but the officer did not answer. Hartnett then ran south a few feet. He saw someone knock Dear down and kept on running, but he soon fell down and an officer came up and arrested him.

Dr. Spencer Brown testified for the defendants that he was a dentist, though he had not completed the course and had no license to practice dentistry and did not practice but did laboratory work, and that at the time of the shooting he was walking on the north side of North avenue at the northwest corner of LaSalle street. He heard an explosion that sounded like a tire or pistol shot, and then he saw a man grabbing his breast and saying, "My God! He shot me!" This man was just north of the rear of the car and the witness saw the man who did the shooting, who was on the north side of the car, close to it, leaving the man who had been shot. The man who did the shooting was a tall man wearing dark clothes with a hat pulled well down over his face, and he ran around the corner and went south on the east side of LaSalle street to Germania place, where he turned east. The witness did not notice the car until the shot was fired and did not see any other man in the car than

286 — 10

the man who was shot and the one who did the shooting. He testified that no one was on the corner of North avenue and LaSalle street when the man passed there. The witness went down the east side of LaSalle street to Germania place, when he heard a scuffle across the street and saw one man standing over another in a snow bank. He went over and stood beside the officer, and the man whom the officer had was not the man who ran south on the east side of LaSalle street.

The eye-witnesses who testified on the part of the prosecution were Harold P. Tucker, Miss Lessner, John L. Meyers and John Haupt. Mrs. Tucker at the time of the trial was sick and in the hospital. Tucker and Miss Lessner testified to the circumstances which have been already stated in regard to meeting Wolf, going to the restaurant, and Wolf's looking out of the window, running down-stairs and Tucker following him down. Tucker testified to the facts stated in regard to the shooting but was unable to identify the man who fired the shot except by his clothing and the fact that he was the taller of the two men. Miss Lessner testified to the same circumstances of the meeting, going to the restaurant, Wolf's looking out of the window and running down-stairs, and further, that she and Mrs. Tucker raised the window and saw one man at the wheel of the car and one man leaning over the running-board; that she saw one of the men shoot, and she identified him positively as the plaintiff in error, describing his clothing as it was described by Tucker. She afterward saw the plaintiff in error when he was brought back in the custody of the police officers in the police patrol wagon and testified that he was the same man who shot Rudolph Wolf.

John L. Meyers was a printer, living at 1421 North LaSalle street. He was walking east on the south side of North avenue, and as he approached the corner of LaSalle street his attention was attracted by two men jumping into an automobile, one of whom tried to start it while the other

stood with one foot on the running-board. As he passed the car he heard the man standing at the side of the machine say, "Hurry up! Give her the juice!" Just after passing the curb on the west side of LaSalle street he turned, and he testified that from that place, five or six feet east of the curb, he saw the murder committed as it has been described. As the man who fired the shot ran south on the west side of LaSalle street Meyers ran south on the east side. As he was running he saw the gun pointed in his direction by the plaintiff in error and heard Hartnett say, "Watch that guy across the street." Meyers took off his hat and ran crouching, and after they had run south a short distance he saw a couple of men stop and call, "Halt!" but Hartnett kept on running. Meyers did not see what the other man did but kept on running south on the east side of LaSalle street, and on the west side of LaSalle street saw another man following Hartnett. This man called "Halt!" twice and fired two shots. Hartnett turned west on Karl street, Meyers following him. Hartnett stumbled, and the other man, who proved to be a police officer, arrested him. They then went back on the west side of LaSalle street and near Germania place found plaintiff in error lying in the snow, in charge of another police officer.

John Haupt was in the restaurant business and was walking west on the south side of North avenue. He testified that when he was about in the center of LaSalle street he heard somebody say, "Give her some more juice!" He walked on to the southwest corner of North avenue and LaSalle street and as he stepped on the sidewalk saw a man run out of Ward & LaRose's saloon on the corner. He saw the shot fired, identified the plaintiff in error as the man who fired it, and followed the two men running south on the west side of LaSalle street to the place where plaintiff in error ran into the police officer. He saw the plaintiff in error have the revolver and the police officer take it away. The plaintiff in error was then taken to the corner of North

avenue and LaSalle street. Meyers and Haupt were just about to pass one another when the shooting occurred.

It cannot be said that the evidence leaves any reasonable doubt of the identity of the plaintiff in error with the man who fired the fatal shot. If it might be said that Tucker's identification of the plaintiff in error by the clothing he was wearing was not sufficiently positive and that Miss Lessner's opportunity for observation from the window might leave her identification open to question, no such objection exists to the testimony of Haupt and Meyers. They were present within a few feet of the tragedy and saw the whole occurrence. They followed the two actors immediately and never lost sight of them. They saw the revolver which plaintiff in error carried in his hand, and if their testimony is true there is no doubt that the plaintiff in error is the man who committed the homicide. The credibility of the witnesses was a question for the jury, and their verdict was in accordance with the evidence.

Counsel for the plaintiff in error insist that the grand jury which returned the indictment was illegally constituted because the record shows that twenty-three grand jurors were summoned and attended and the court appointed a person not a grand juror as foreman, who indorsed the indictment as foreman, and that the record does not show that the foreman of the grand jury was sworn. This argument is based on the fact that the list of grand jurors summoned contained the name of Walter J. Raymer, that the court appointed Walter H. Raymer foreman of the grand jury, and that the indorsement on the back of the indictment, "A true bill," is signed Walter H. Raymer. In law the middle initial of a name is no part of the name. An indictment charging a robbery to have been committed on Isaac R. Randolph is sustained by proof of a robbery committed on Isaac B. Randolph. (*Miller* v. *People,* 39 Ill. 457; *Tucker* v. *People,* 122 id. 583; *Langdon* v. *People,* 133 id. 382.) "The common law recognizes but one christian name, and a middle

initial may be dropped and resumed or changed at pleasure. It is not material in any legal proceeding, and its presence or absence or a difference in it does not create a variance." (*Claflin* v. *City of Chicago,* 178 Ill. 549.) It is essential to the validity of a record of a criminal case to show that the grand jury was sworn. The record shows that, the panel of grand jurors being filled, the court appointed Walter H. Raymer foreman, and that the grand jurors were duly sworn and charged by the court. The record sufficiently shows a compliance with the statute in organizing a grand jury when it recites that the grand jury was called, empaneled and a foreman appointed. (*Williams* v. *People,* 54 Ill. 422.) The presumption must be indulged from the recital that the grand jurors were duly sworn, that they were sworn according to law,—that is, that the foreman was first sworn and that the other grand jurors were then sworn to keep and observe the same oath. ·

The plaintiff in error contends that he was forced to trial without being given a reasonable time to procure counsel or prepare a defense. The indictment was returned on January 21. On January 23 the case was called and upon the application of the defendant Hartnett was continued for two weeks, until February 6. On February 1 the plaintiff in error was brought into court and the question of appointment of counsel to defend him was discussed. He stated that he had talked with attorney Williams, and Williams was sent for, who said he did not want to try the case, and the court gave the plaintiff in error until ten o'clock the next morning to get counsel, stating that if he did not do so counsel would be appointed to defend him. On the next morning, February 2, the plaintiff in error stated that he had not got counsel, and Williams stated that after speaking to the plaintiff in error it was agreed that Eugene McGarry would be appointed to defend him, to which the plaintiff in error assented. McGarry was then appointed to defend the plaintiff in error and it was announced that the case was set for

trial on February 6. On February 6 McGarry made a motion for a continuance for a reasonable time in which to prepare a defense, asking that the cause be continued 'for two weeks for that purpose. After a conference with the attorneys for both defendants and with the plaintiff in error the case was postponed until Wednesday, February 13. On that day Williams appeared for the plaintiff in error and made a motion on his behalf for a continuance on account of the absence of Nicholas Allegretti, who was stated to be a material witness. McGarry by leave of the court withdrew his appearance. The affidavit in regard to Allegretti did not set forth any fact which the defendant expected to prove by him, though Williams stated that he was a very material witness but he did not wish to state then what he expected him to testify to; that he was ill in Michigan with a lingering disease, and Williams wanted time to go to Michigan himself and only wanted until Monday morning. The further grounds of continuance stated in the affidavit were the public feeling against the defendants which had been excited in the community on account of the wide publicity which had been given to the case by the newspapers and the nature of the newspaper articles, which would make it impossible to secure a fair or impartial jury or trial. The newspaper articles were not set out, although it was alleged that they were in reference to crime waves in general and charged that defendants were guilty of this particular crime and should be hanged, and that the sentiment among the jurors at the time, due to newspaper publicity of all crimes in general, would absolutely prevent the securing of a jury not actually prejudiced. It was alleged that there had been newspaper articles concerning certain motions and proceedings growing out of the petition for a change of venue, and that the motion had been discussed on different occasions when jurors of the panel were present, and that the charge of fraud had been openly made in court by the assistant State's attorney in the presence and hearing of jurors on the panel who might

be called to sit on this case; that the question of a continuance had been discussed in their hearing and a certain statement made by one of the defendants to the other in reference to a lawyer who had been called to represent him; that the newspapers in repeating the statements did not give them in their correct form but changed them so as to give the impression that the defendants had admitted their guilt and were willing to accept any term less than the death penalty; that this statement was false and great harm was done and could not be eradicated except by a continuance of the cause until the prospective jurors might have forgotten the statement as alleged in the newspapers. It was also alleged that anonymous letters had been mailed both to the press and State's attorney, which were, in substance, that mob rule and lynch law prevailed, and, according to newspaper quotations, when brought to the attention of the State's attorney his reply was, "Them is my sentiments;" that newspapers had come out with the statement that the defendant should be hanged, and it had been publicly expressed by no less a person than a judge presiding in the criminal court that he would continue all cases so the attorney in this case might devote his entire time to trying or representing Earl Dear and dispose of his case as quickly as possible and that he might be hanged at as early a date as possible. The affidavits of the two defendants, alone, were presented on this motion. Williams had been engaged in the trial of other cases in court, but no request for further time, based on any showing of a lack of preparation, was made, and no statement that counsel was not familiar with the case or was not prepared to go on with the trial. It is not claimed that the judge of the criminal court referred to in the affidavit of the plaintiff in error was the judge who tried the case, or that the judge who tried the case was prejudiced against the plaintiff in error. It is only suggested that the judicial ermine cannot obliterate human impulses, and that the trial judge well knew that any continuance granted would be

construed by the public press at that time as a wrongful delay of justice and result in criticism of any judge who might wish to stand between the majesty of the law and the cry of the mob. We cannot accept the plaintiff in error's construction of newspaper statements, which are not themselves set up, as the cry of the mob. No showing was made which required a further continuance of the case, no motion for a change of venue was made, and, in fact, twelve jurors were obtained to try the case to no one of whom did the plaintiff in error make any objection. Allegretti's name was mentioned in the trial as one who was in the company of the defendants during the afternoon or evening of the day the crime was committed, but it is evident from the record that he could not have testified to any facts which would have been of any benefit to the defendants. It is apparent from the whole record that the plaintiff in error suffered no prejudice by the denial of a further continuance.

It is contended that the court erroneously instructed the jury and erred in refusing to give instructions asked by the defendants. Fourteen instructions were given at the request of the State's attorney and eleven at the request of the defendants. Fifty-nine instructions asked by the defendants were refused. No objections to the People's instructions are pointed out. Counsel for the plaintiff in error contend in the brief that there was error in refusing twenty-five of the requested instructions, referring to them by number, only, and not pointing out any specific objection to any one of them. We have, however, carefully read all the instructions in the abstract. Many of the instructions refused are statements, in different form, of the same principle of law. Some of them are argumentative. Others refer to the principles which apply where a conviction is sought upon circumstantial evidence, and are therefore not applicable here, where the testimony is direct. The instructions refused, so far as they stated correct principles of law applicable to the case, were sufficiently covered by those which were given.

A party has no right to have the rules of law applicable to the case repeated in various forms in different instructions. Counsel refer particularly to instructions 6, 7 and 8 as proper instructions which should have been given. They were all with reference to the necessity of proving the guilt of the defendants beyond a reasonable doubt and the rule that mere probabilities or a preponderance of the evidence were not sufficient to warrant a conviction. They were covered by the instructions which were given.

It is contended that the State's attorney was guilty of misconduct in his argument to the jury by indulging in intemperate and inflammatory language and denouncing the plaintiff in error as guilty of the crime without reference to the evidence. Several pages of the abstract consist of an extract from the argument of the State's attorney. The portion which is specifically objected to at this time and is most vigorously commented on in the argument is the following:

"There can be no question about what the punishment ought to be in this case. If these men are guilty they ought to die; if they are not guilty they ought to go free. If you approve of perjury and of Dr. Brown set these men free, but if you believe in the enforcement of the law, if you believe in the protection of society, if you believe in offering a certain degree of security to men and women who walk the streets of our city against the beasts of prey who ply their trade at night to steal and rob, if you believe that the activity of a gunman should be curbed, why, there is one way to do it in this case. Give to Earl Dear and to Eugene Hartnett, both guilty of murder without any extenuating circumstances, guilty of a crime for which there is no excuse, the enforcement of the law,—death."

The portion of the argument preceding this extract consisted of a review of the evidence of the various witnesses. The extract deals with the question of the duty of the jury in regard to fixing the punishment. It was proper for

the State's attorney to discuss this question. His language, "Give to Earl Dear and to Eugene Hartnett, both guilty of murder without any extenuating circumstances, guilty of a crime for which there is no excuse, the enforcement of the law,—death," was not denouncing them as guilty from his own knowledge or without a reference to the evidence, but, taken in connection with his whole argument, simply referred to the evidence as establishing beyond a reasonable doubt that they were guilty, and that if they were guilty they should receive the extreme penalty of the law. We have read with care all of the argument of the State's attorney which is set forth in the abstract. In the course of the argument the State's attorney asked the question, "What sympathy did Earl Dear show that little woman who testified here in this case?"—referring to the widow of Rudolph Wolf. An objection was sustained by the court. The portion of the argument of the State's attorney which is set out consists of a discussion of the evidence which the State's attorney claimed showed a wanton, reckless murder without mitigating circumstances, for which the only commensurate punishment was death; that the identification of Dear by the witnesses was complete; that the only evidence to the contrary was perjury. The argument was denunciatory, but it was based upon the evidence and the State's attorney's claim as to the facts proved. He denounced the defendants as murderers because they were so proved by the evidence and the witness as a perjurer because his testimony was shown to be untrue. It is within the scope of a proper and fair argument to denounce a defendant as guilty of the crime charged and a witness as guilty of perjury where an inference of such guilt may be fairly inferred from the facts and circumstances shown by the evidence. *People* v. *Strauch,* 240 Ill. 60; *People* v. *Hagenow,* 236 id. 514; *Crocker* v. *People,* 213 id. 287.

The remaining objection is that the verdict did not find the age of the defendant. Section 2 of the act "to revise

the law in relation to the sentence and commitment of persons convicted of crime or offenses and providing for a system of parole and to repeal certain acts and parts of acts therein named," approved June 25, 1917, (Laws of 1917, p. 353,) requires that the jury by their verdict find the age of the defendant, as near as may be, in all cases. The verdict in this case made no reference to the age of the plaintiff in error. The object of the act referred to is to provide a system of parole. A statute must be construed with reference to its general intent and the purpose for which it was passed. "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute." (Sutherland on Stat. Const. sec. 246.) Section 1 of the act provides that in all cases where any person over ten years of age shall be charged with misprision of treason, murder, rape or kidnaping and the jury shall find the defendant guilty the jury shall also fix the punishment, and if the punishment imposes imprisonment the jury shall fix the term of such imprisonment, and in every such case of imprisonment the court shall sentence the defendant to the penitentiary, except as provided in clauses from 1 to 4, inclusive, in section 3 of the act, and in such cases the court may, in its discretion, commit as in those clauses provided. Section 3 provides that, except for the crimes enumerated in section 1 of the act, every person adjudged guilty of a felony punishable by imprisonment in the penitentiary shall be sentenced to the penitentiary, and the term of imprisonment shall not be fixed but shall not be less than the minimum nor more than the maximum provided by law, provided—

"Clause 1. That every male person between the ages of sixteen and twenty-six years, except in capital cases, may, in the discretion of the court, be sentenced to the reformatory instead of the penitentiary.

"Clause 2. That every male person between the ages of twenty-one and twenty-six years who has previously been

sentenced to the penitentiary or reformatory in this or any other State, district or country, may, in the discretion of the court, be sentenced to the penitentiary instead of the reformatory.

"Clause 3. That every male person between the ages of ten and sixteen years adjudged guilty of any offense enumerated in this section, except capital offense, may, in the discretion of the court, be sentenced and committed to such other institution (other than the reformatory) as is provided by law for the incarceration, punishment, discipline, training or reformation of such class of persons, instead of the penitentiary.

"Clause 4. That every female person between the ages of ten and eighteen years, adjudged guilty of any offense enumerated in this section, except a capital offense, may, in the discretion of the court, be sentenced and committed to such other institution as is now provided by law, or may be provided by law, for the incarceration, punishment, discipline, training or reformation of such class of persons, instead of the penitentiary."

The object of the provision requiring the jury to find the age of the defendant is to enable the court to exercise its discretion, under these clauses, as to the place of imprisonment. Where the punishment is capital the court has no discretion and no necessity exists for requiring the jury to find the age of the defendant. Under no circumstances could the defendant have derived any advantage from the finding of his age in the verdict or be prejudiced by the failure to find it. In *Sullivan* v. *People,* 156 Ill. 94, it was held that section 10 of the Reformatory act, which then required the jury in all criminal cases to find whether or not the defendant was between the ages of ten and twenty-one years, and if between those ages to find, as nearly as might be, the age of the defendant, was intended to apply to minors, only, for the reason that the purpose of the act was to leave the duty of the jury to fix the punishment of adults un-

changed and to provide that they should not fix the punishment where the defendant was between the ages of ten and twenty-one years. The reasoning is applicable to this statute, the object of which is to give a discretion to the court in regard to the imprisonment to be imposed but does not affect the judgment of the court where the penalty is death.

The judgment will be affirmed, and the clerk of this court is directed to enter an order fixing the period between nine o'clock A. M. and five o'clock P. M. of the seventh day of February, 1919, as the time when the original sentence of death entered in the criminal court shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of Cook county.          *Judgment affirmed.*