## STATE v. WOODS.

No. 3938.   Decided September 24, 1923.   Rehearing denied November 21, 1923.   (220 Pac. 215.)

1.  HOMICIDE—PROOF OF MOTIVE MAY BE CONSIDERED BY JURY, BUT IS NOT INDISPENSABLE TO CONVICTION. In a prosecution for murder, proof of motive, which may be shown by positive evidence or gleaned from the facts and surroundings, is not indispensable to conviction; the presence or absence thereof being merely a circumstance to be considered and given such weight as is deemed proper by the jury.

2.  HOMICIDE—CONVICTION OF FIRST DEGREE MURDER SUSTAINED. In a prosecution for wife murder, evidence as to accident insurance policies payable to defendant on his wife's death, and his preparation for the crime, held sufficient to support a conviction

of first degree murder, in view of the incredibility of his own story.

3. CRIMINAL LAW—IMPROPER CROSS-EXAMINATION OF DEFENDANT HELD NOT REVERSIBLE ERROR IN VIEW OF CONVINCING EVIDENCE OF GUILT. Cross-examination of defendant as to communications to his counsel respecting the defense of insanity and incriminatory statements to a police officer while in his custody, without permitting defendant to explain them, held not reversible error in view of convincing and conclusive evidence of defendant's guilt.

4. HOMICIDE—ADMISSION OF IMMATERIAL EVIDENCE HELD HARMLESS. In a murder prosecution, admission of immaterial evidence as to the proposed forgery of a deed by defendant, his reference to "another job to pull off," a medical prescription procured and used by him, and a telegram concerning threatened action against him unless he paid some one some money, held harmless error.

5. WITNESSES—ATTORNEY AND CLIENT CANNOT BE QUESTIONED AS TO LATTER'S STATEMENTS TO FORMER. Neither attorney nor client can be questioned as to what the latter told the former.

6. CRIMINAL LAW—CROSS-EXAMINATION OF DEFENDANT AS TO WHETHER HE SUGGESTED DEFENSE OF INSANITY HELD HARMLESS ERROR. Where the jurors were interrogated on voir dire by the defense as to whether they would acquit on the ground of insanity if so instructed by the court, a question asked defendant on cross-examination, as to whether he told his attorney that he was insane, was rendered harmless by his unequivocal denial.

7. CRIMINAL LAW—PAPERS OBTAINED BY BANK OFFICER FROM DEFENDANT'S SAFETY DEPOSIT BOX HELD ADMISSIBLE. In a prosecution for wife murder, accident insurance policies payable to defendant on the wife's death held admissible as against the objection that they were obtained from defendant's safety deposit box in a bank by an officer thereof in violation of Const. art. 1, § 14, and compelled him to be a witness against himself in violation of section 12; there being no charge nor offer of proof that any state or county officer made, authorized, or supervised a search.

8. CRIMINAL LAW—PHOTOGRAPH OF DECEASED'S BURNED BODY HELD ADMISSIBLE. In a prosecution for wife murder, a photograph of deceased's burned body on a bed held admissible, though gruesome and only a repetition of verbal descriptions, as against objections that it was intended merely to arouse the prejudice

and inflame the passions of the jury and conveyed no new information; photographs, like maps and diagrams, being admissible to illustrate or explain the testimony.[1]

9. CRIMINAL LAW—GENERAL OBJECTIONS AND EXCEPTIONS TO REMARKS, WITHOUT REQUESTS FOR INSTRUCTIONS AND RULINGS AND RESERVATION OF EXCEPTIONS AT PROPER TIME, INSUFFICIENT. General objections and exceptions to remarks of the district attorney when made, without proper requests for instructions and rulings and reservation of exceptions at the propert time, present nothing for review.

10. CRIMINAL LAW—TECHNICAL ERRORS DISREGARDED UNLESS CLEARLY HARMFUL. Technical errors must be disregarded, unless clearly harmful to defendant, and the jury's verdict sustained, unless the Supreme Court is satisfied, from all the evidence, that a miscarriage of justice resulted; error in criminal cases not being presumed prejudicial in Utah.[2]

On Application for Rehearing.

11. CRIMINAL LAW—ERROR HELD HARMLESS ONLY IF VERDICT, IN ABSENCE THEREOF, SHOULD NOT HAVE BEEN DIFFERENT. To hold an error harmless to defendant, the Supreme Court should be satisfield that, in the absence thereof, the jurors, as reasonable men, should not have found any other verdict than that of guilty, particularly in view of Comp. Laws 1917, § 9231, requiring that the court disregard errors not resulting in a miscarriage of justice, which, as applied to instructions, exclusion and admission of evidence that should not affect the minds of reasonable men, misconduct of prosecuting attorneys, etc., means error plus injury, the burden of proving which is on defendant.[3]

12. CRIMINAL LAW—SUPREME COURT WILL EXAMINE RECORD TO DETERMINE WHETHER ERROR IS PREJUDICIAL. The Supreme Court will not presume that error in a criminal case is prejudicial, but will examine the record to determine whether it deprived defendant of a substantial right to his injury, as well as to see whether there is substantial evidence supporting a verdict of guilty.[4]

[1] *Blake* v. *Harding*, 54 Utah, 158, 180 Pac. 172; *Johnson* v. *Railroad Co.*, 35 Utah, 285, 100 Pac. 390.

[2] *State* v. *Siddoway*, 61 Utah, 189, 211 Pac. 968.

[3] *State* v. *Cluff*, 48 Utah, 102, 158 Pac. 701; *State* v. *Seymour*, 49 Utah, 285, 163 Pac. 789; *State* v. *Iverson*, 55 Utah, 230, 185 Pac. 364; *State* v. *Nell*, 59 Utah, 68, 202 Pac. 7; *State* v. *Siddoway*, 61 Utah, 189, 211 Pac. 968.

[4] *State* v. *Thorne*, 41 Utah, 414, 126 Pac. 286, Ann. Cas. 1915D, 90.

13. CRIMINAL LAW—EVIDENCE OF GUILT HELD SO CONCLUSIVE THAT
JURY COULD NOT REASONABLY RECOMMEND MITIGATION OF DEATH
PENALTY, NOTWITHSTANDING ERRORS COMPLAINED OF. Evidence
of defendant's guilt of first degree murder *held* so conclusive
that the jury could not reasonably have recommended mitiga-
tion of the death penalty to life imprisonment, notwithstanding
alleged errors; the provision giving them such discretion con-
templating selection of jurors not so bound by conscientious
opinions as to capital punishment as to be unable to act as the
circumstances demand.[5]

Appeal from District Court, Third District, Salt Lake
County; *Ephraim Hanson,* Judge.

Omer R. Woods was convicted of first degree murder, and
he appeals.

AFFIRMED AND REMANDED, with instructions.

*James F. Ailshie,* of Cœur D'Alene, Idaho, and *Thomas
Ramage,* of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal. Farr,* Asst. Atty.
Gen., for the State.

WEBER, C. J.

Due to the severe and prolonged illness of Mr. Justice
FRICK, the consideration of this case has been delayed.
Happily the health of Justice FRICK is now restored and
each member of this court has taken part in the decision of
this case and given it the careful consideration which its
gravity demands.

Omer R. Woods was charged with having murdered his
wife, was convicted of murder in the first degree, and appeals
from a judgment inflicting the death penalty.

With his wife and 16 year old daughter, the appellant re-
sided at the Pauline apartments at the corner of First South

---

[5] *State* v. *Mewhinney,* 43 Utah, 135, 134 Pac. 632, L. R. A. 1916D,
590, Ann. Cas. 1916C, 537.

and Third East streets, Salt Lake City. On January 9, 1922, between 1 and 2 o'clock p. m., a tenant living immediately above the apartment occupied by appellant discovered smoke coming from the apartment below. She notified the proprietress of the apartment house, who went to the door of the Woods apartment, rang the bell with one hand, and knocked on the door with the other. She had a bunch of keys in her hand and could hear coughing on the inside. Before she could find the proper key to the apartment door, it was opened from the inside, and Omer R. Woods, the defendant staggered out and fell to the floor. In the meantime the fire department was notified and arrived upon the scene at 1:57 p. m. When asked by one of the women present what had happened, Woods said that two burglars came to his apartment, one a tall man and the other short; that they knocked him down, bound him hand and foot, bound and gagged his wife, and set fire to her. In answer to a question as to where Mrs. Woods was, he said, "In the bedroom." After the arrival of the fire department and the extinguishing of the fire, Mrs. Woods was found in the bedroom of the apartment lying on the bed, her feet bound, her hands tied behind her back, a gag in her mouth, her body badly burned, her life extinct. The odor of benzine was detected on the body and clothing and upon the bedclothes. Dr. Galligan, who made an examination of the body before its removal from the apartment, testified that when he arrived "there was the remains of a smouldering fire and part of the bedclothing, and the clothing of the woman was still afire when I arrived, and the body was badly burned; the woman was dead." After describing how the woman had been tied and the extent of the burns on her body, limbs, and face, and after testifying that he performed an autopsy on the body, he stated that in his opinion death resulted from either strangulation or from concussion of the brain due to an extraneous injury. From the fact that there was no evidence of inspiration of smoke or other gases and from the character of the burns, he concluded she was dead before she was placed on the bed.

A quart bottle of benzine was purchased at a drug store

by appellant at some time between 11:30 a. m. and 12:30 p. m. on the day of the homicide. The clerk who sold the benzine identified the accused as the purchaser. The clerk said that when he came into the store the defendant asked for a small bottle of benzine. A pint having been produced, the defendant said: "Better give me a quart; we are doing a lot of cleaning at our house." Thereupon the quart bottle of benzine was sold and delivered to the defendant. Defendant, in his testimony, admitted procuring the benzine, but claimed he bought it on January 7th.

Representatives of the police department arrived upon the scene about the same time that the fire department appeared. The defendant was promptly arrested and taken to the police headquarters, where he made a statement substantially similar to that to which he testified at the trial. As a witness in his own behalf, he testified in substance that on January 9, 1922, the day of the murder, he went home at 12 o'clock noon, ate lunch, went to the street and posted some letters, returned home, smoked. a cigar, and went into the bathroom, and was shaving when the doorbell rang.

"I went to open the door, and there were two men at the door. The larger man was in front, and just as I opened the door he had hold of the other knob, and as I remember he set his foot inside the door. He had hold of the knob with his left hand, and he shoved a gun in my face or right next to my ear, just below my face, and said, 'We want your money,' and from there he kind of backed me toward the bathroom—probably inside of the door, or probably at the edge of the door, something like that. I don't remember just where it was; and as he did that the smaller fellow rushed behind him and went on into the living room, and as he did that the fellow who had the gun on me stepped toward the living room backwards. I don't know whether he told me to follow him up, or what he did say, but anyway, as he stepped backwards toward the living room, I stepped forward toward him. He still held the gun on me. The other, the smaller fellow, had gone on into the dining room. I was about in the door. I don't know just where. I think I was a little more inside of the living room than I was in the hallway. * * * My wife was standing at or near the table, and apparently had just begun or was fixing to clean up the table. I don't think she had yet. She might have moved something, but I don't know whether she had or not, because I had been in the bathroom; but anyway she was there, and the little fellow had gone over to her and was

throwing a towel or rug or something over her head like. I told him to stop that. I said: 'Don't hurt my wife; you can have my money or anything you want, but don't hurt my wife.' I started to advance, and this other fellow shoved me back and hit me and knocked me down, and from that he rushed me on into the bathroom while I was on my hands and feet, trying to get up. * * * When he knocked me down I fell backwards and caught myself with my hands like this; and just as I was down this way he shoved me along. I remember going over this way and on into the bathroom. Then, when I was in there, he turned me over, and I said, 'Don't hurt me' or something. I don't remember just what I did say, because I was very much excited. And it was just a little while until this smaller fellow came in, and he threw down something to tie me with. 'Tie him with this,' he says, or something like that. Anyway, they proceeded to tie me with a cord. I wouldn't be sure that he said, 'Tie him with this,' but something about tying. I don't know just what he said. They proceeded to tie me. First they fastened my feet, and then they pulled my feet up in this direction and put my arm around the leg of the bathtub and tied my hands together like this; and then they tied a towel or something around my mouth, a gag, and tied it tight. Then they went out, and while they were gone I commenced moving my hands and my feet, trying to loosen the cord. I was very much stunned from the blow, because he gave me a pretty hard blow, and that stunned me and made me feel dizzy. While I don't think I was totally unconscious, I was dazed from the blow, stunned like. Well, they went out, and they were gone a few minutes, and then they came back in there and went through my pockets here (indicating), and said, 'Where is your money?' or something; I told them, and they took my money out of my front pocket. And then they looked in the clothes closet, throwing a lot of stuff out of there. My head was next to the door, and they threw things over my head. I don't know what they were looking for, but anyway there was a lot of dirty clothes in there, and they threw them out, and they looked around awhile, but not very long. They were not in there very long, and then they went out, and they shut the bathroom door as they went out, and I didn't see them after that time."

Other evidence in the case will be referred to hereinafter, but the foregoing presents the more important parts of the testimony.

On this record, appellant's counsel insist that "it is more than doubtful if the circumstances proven are sufficient to support a conviction" under the rule that "in order to justify a conviction upon circumstantial evidence the evidence must not only be consistent with the guilt of the defendant

but inconsistent with every other reasonable hypothesis.''
Counsel further say that—

"When the justices of this court of last resort shall have read
this record, we believe they will close their perusal of it in a state
of doubt and wonderment as to why and by whom the offense was
committed.''

With patience and care we have read the record, and we
are in a state of neither doubt nor wonderment. Why the
offense was committed is a problem not difficult of solution,
nor have we any doubt whatever by whom the crime
was committed. Evidence tending to prove motive was
furnished by the state. Proof of motive, however, is
not indispensable to conviction.

"Evidence of motive is sometimes of assistance in removing
doubt, and completing proof which might otherwise be unsatisfac-
tory, and that motive may either be shown by positive evidence, or
gleaned from the facts and surroundings of the act. The motive
then becomes a circumstance, but nothing more than a circum-
stance, to be considered by the jury, and its absence is equally a
circumstance in favor of the accused, to be given such weight as it
deems proper." *People* v. *Durrant*, 116 Cal. 179, 48 Pac. 75.

For some years the defendant was in the government serv-
ice. In 1920 he was with the Treasury Department in the
estate tax division with headquarters at Boise, Idaho. In the
early part of July he was transferred to Salt Lake City. His
wife had never lived with him in Idaho, nor was she ever in
Salt Lake City before September, 1920. Before leaving Idaho
in July, the defendant secured an insurance policy insuring
himself against accident, his wife being named as beneficiary
in case of loss of life by accident. He also obtained a policy
insuring his wife against loss resulting from bodily injuries:
(1) While riding as a passenger in a railway passenger car;
(2) while a passenger in a passenger elevator, and (3) by
reason and in consequence of the burning of a building, pro-
viding the insured was therein at the commencement of the
fire, and in case of loss of life the insurance became payable
to her husband in the sum of $10,000. The annual premium
on this policy was paid in 1921, and it was in force and effect
at the time of the murder. On December 21, 1921, the de-
fendant procured further insurance of his wife against acci-

dent, he being the beneficiary in the event of loss of life by accidental means in the sum of $3,000 with double indemnity or $6,000 if loss of life resulted "in consequence of the burning of any building while the insured is therein."

The evidence fully justified the jury in finding that this $16,000 accident insurance recoverable by the defendant in case of the loss of life of his wife in a particular manner was the motive for the murder. The evidence also justified the finding that there was preparation for the crime as shown by the purchase of benzine with which the clothing of the murdered woman and the bedclothing were saturated. The defendant was in the apartment when the murder was committed.

Such is the substance of the case against Woods. Then comes the story told by him. His counsel argue that—

"It is no more improbable or unreasonable to suppose that two men came into this apartment at the time and in the manner and under the circumstances stated by the defendant and committed this offense, than it is to believe that this defendant committed the offense at the time and in the manner and under the circumstances as claimed by the state."

We think otherwise. So did the jury. It is highly improbable that two strangers would at high noon enter a tenanted apartment house in a populous part of the city for the purpose of robbing some of the occupants. Defendant says they rang the bell of the door of his apartment; that he went to the door and opened it, when he was confronted by a tall stranger who shoved a gun in his face and said, "We want your money," and then a smaller stranger rushed in, went into the living room, and "as he did that the fellow who had the gun on me stepped toward the living room." "I stepped forward toward him. He still held the gun on me," the smaller stranger having gone into the dining room. Mrs. Woods was in the dining room, "and the little fellow had gone over to her and was throwing a towel or rug or something over her head like. I told him to stop. I said: 'Don't hurt my wife. You can have my money or anything you want, but don't hurt my wife.'" Defendant then started to advance, when he was knocked down by the tall robber and

rushed into the bathroom. During all this time before he was stunned by the alleged blow which felled him, defendant could easily have given the alarm and aroused other occupants of the apartment house. Mrs. Woods must have heard the comments of the stranger and the pleading of her husband that she be not mistreated. She must have noticed the approach of the other robber. She made no attempt at flight— no attempt to escape through either of the doors of the apartment. Se stood there like a statue, making no outcry. Can it be possible that she was literally paralyzed with fright, her muscles paralyzed so she could not move, her throat so she could not scream? In the meantime defendant is bound and gagged while offering a feeble resistance. The robbers then left the bathroom for a few moments. Returning, they asked defendant where his money was. He testified: ''I told them. Then they took my money out of my front pocket.'' He testified that $75 was taken out of his front pocket. When searched at the police station, $100 was found in his hip pocket. As they seemed to be looking for money only, the strangers did not relieve their victim of his watch. After taking his money, the robbers looked into the clothes chest, from which some soiled clothes were thrown, and, in the language of defendant: ''They looked around awhile, but not very long. They were not in there very long, and then they went out and they shut the bathroom door as they went out, and I didn't see them after that time.''

Here it becomes pertinent to inquire what could have induced these strangers, these robbers, to murder Mrs. Woods. If they possibly were known to Mrs. Woods, they may have committed murder to conceal the crime of robbery. That is a violent presumption, but suppose they murdered her to prevent identification by her in case of arrest. What purpose could they have in placing her upon the bed, bound hand and foot and gagged, and then making the bed her funeral pyre? And why would the robbers kill and burn the woman and not the man?

The defendant's astounding story is unbelievable. The jury did not believe it and could not as reasonable men ac-

cept it as true. And unless they believed defendant's incredible tale, they could have no doubt whatever of his guilt.

In discussing the assignments of error counsel aver that during the cross-examination of defendant the prosecutor's conduct and many of his questions were unfair and prejudicial to defendant. It is true that some of the cross-examination was argumentative, that useless repetition occurred, due to the apparent zeal of the prosecutor and          **3** his determination to present every particle of evidence tending to strengthen the prosecution; but in view of the convincing and conclusive evidence of defendant's guilt we cannot say that the cross-examination contained reversible error.

While the defendant was on the witness stand, he was cross-examined with reference to certain conversation he had with the witness Vadney, and was asked whether he did not say to Vadney that he had come in contact with an estate left by a man in Idaho who had surviving two female relatives, and that it was supposed that the decedent had executed a deed giving his property to these two relatives, but that the deed could not be found, and that he (defendant) had an attorney in American Falls who would sign a deed with the signature of the decedent and put an acknowledgment on that deed, and that Vadney could make some money by selling the deed to the two female relatives; also, whether defendant did not say to Vadney, after having stated this proposition, "I have another job to pull off which will pay more money."

After the question relating to the Idaho deed had been answered, the question was objected to; but no motion to strike the answer was made in which he denied having had such conversation. After defendant was asked whether he had not told Vadney that "I have another job to pull off which will pay more money," counsel for defendant said, "I have no objection to that." Thereafter Vadney was placed on the stand and was permitted to answer an impeaching question in regard to the deeds, and that the defendant had said to him that he had another job to pull off which would pay more money.

Suppose Woods had said that he had another job to pull off, another crime to commit, and suppose further that with Vadney's help he had committed such crime—suppose he had committed forgery as claimed to have been proposed—that would not have been admissible as proof to prove the murder by him of his wife. Proof of such crimes, independent and disconnected, would not be competent evidence as tending to show that defendant had committed the particular crime of which he was accused.

A medical prescription procured and used by defendant was another instance of immaterial evidence that was introduced. It was foreign to any issue in the case.

Again, a telegram from a woman at Boise, saying that some one had threatened to notify headquarters at Washington if defendant did not pay some one some money, was wholly immaterial. The telegram did not tend to prove anything either for or against the defendant. It was wholly harmless and of no consequence.

What is criticized by counsel as a most extraordinary and prejudicial occurrence in the course of the trial was this question asked of defendant on cross-examination, "And did you tell your attorney that you were insane?" "I did not," was the answer. After the question had been answered, an objection was interposed by the attorney for defendant in which it was stated "A client does not have to answer anything like that, what he tells his attorney or what his attorney told him." No motion was made to strike the question and answer. To the statement of defendant's counsel the district attorney replied: "I think that is wrong. The attorney can't be interrogated with reference to what the client has told him but the client may." To this opposing counsel replied, "Oh, I withdraw the objection."

Whether defendant's attorney agreed to this novel and unique proposition of law, or whether he thought the answer was of advantage to defendant, we know not; but whatever the purpose of withdrawing the objection, the error would not have been harmful.

It appears that during their examination the jurors had

been interrogated on voir dire by the defense as to whether they would follow the instruction of the court should the court instruct them to bring in a verdict for defendant on the ground of insanity. The defense of insanity having thus been suggested to the jury, the unequivocal denial by defendant that he had ever thought of or suggested such a defense was helpful rather than harmful to him.

Mr. Chamberlain, an assistant cashier of the National Copper Bank, testifying as a witness for the state, said that he, in connection with other of the bank officers, had supervision over the safety deposit box on the records in the name of O. R. Woods, the defendant. The district attorney then requested the witness to ascertain whether that safety deposit box contained some accident insurance policies. When the accident insurance policies had been taken by the bank officials from the safety deposit box of the defendant and were produced in court, they were objected to on the ground that "they went down to the safety deposit box and got these private papers; they were illegally secured"; that "they are incompetent, irrelevant, and immaterial," and were obtained in violation of this defendant's constitutional rights under sections 12 and 14 of article 1 of the Constitution of this state; and that "it was an attempt on the part of the state to compel the defendant to be a witness against himself."

No charge was made and no offer of proof was made that any officer of either state or county had made or authorized or supervised a search, either legal or illegal, and thereby secured the safety deposit box or its contents. The evidence on the subject is simply that Mr. Chamberlain, an officer of the bank, opened the box and produced the policies. What might be the effect of an unlawful search and seizure by officers of the state or county is a question that does not arise here and upon which we express no opinion. The accident insurance policies were properly identified, were competent and material, and no valid objection was interposed to their admission in evidence.

A photograph of the bedroom, showing the blackened walls and the burned bedclothes, with the bed and the burned body

of defendant's wife, taken on January 9th, shortly after the murder, was admitted in evidence over the objections of the defense. It is insisted that the photograph was inadmissible and that the sole purpose of its introduction was to arouse the prejudice and inflame the passions of the jury. The photograph in this instance was not inadmissible, though it was only a repetition of what had been described verbally by the physician and by the officers; it may not have conveyed any information which had not already been given to the jury, but that would not be a reason for its exclusion. Photographs are generally admitted for the same reason that maps and diagrams in illustration or explanation of the testimony are admitted. *Blake* v. *Harding,* 54 Utah, 158, 180 Pac. 172; *Johnson* v. *Railroad Co.,* 35 Utah, 285, 100 Pac. 390; *State* v. *Casey* (Or.) 213 Pac. 771; *Tillman* v. *State,* 112 Ark. 236, 166 S. W. 582. The fact that the picture of the dead woman was gruesome presents no valid objection to its admission. *People* v. *Balestieri,* 23 Cal. App. 708, 139 Pac. 821.

During the closing argument of the district attorney, he made a number of statements which were objected to by the defense. With some slight variations the objection interposed by counsel in each instance was, "I object to the remarks of the district attorney and assign it as prejudicial error," or "I except to the remarks of counsel and assign it as prejudicial error." This sort of objection or exception, without anything further, without a proper request for instructions to the jury and a ruling by the court, and an exception reserved at the proper time, presents nothing for review on appeal. We have, however, carefully considered the remarks of the district attorney that were objected to. We do not think they contain reversible error, especially when considered in connection with the instructions in which the court admonished the jury not to consider or be influenced by any "statement of counsel as to what the evidence is unless they state it correctly, nor by any statement of facts by counsel not shown by the evidence."

The instructions were clear and so fair that no exceptions

were taken to any of them.  At no time during the progress of the trial was any request made for more specific instruction in relation to any of the matters complained of.

Errors occurred during the trial, and some evidence was admitted that should have been excluded.  Did the erroneously admitted evidence strengthen the prosecution?  If not admitted, might the result have been different?  Unless prejudicial, unless they probably affected the result and are clearly harmful to a defendant, all technical errors must be disregarded.  Error, when it occurs in a criminal case, is not presumed to be prejudicial in this state.

"The statute that provides that technical errors in criminal cases shall be disregarded is mandatory, and, unless upon a review of all the evidence we are satisfied that a miscarriage of justice has resulted, we have no right to interfere with the jury's verdict." *State* v. *Siddoway*, 61 Utah, 189, 211 Pac. 968.

Stripped of all extraneous matter, the competent and material evidence remaining is more than sufficient to establish the defendant's guilt beyond all doubt.

The judgment is affirmed, and the cause is remanded to the district court of Salt Lake county, with instructions to fix the date of execution.

GIDEON and CHERRY, JJ., concur.

FRICK, J.  I concur in the affirmance of the judgment.

Ordinarily, in view of the conclusive character of the evidence which establishes defendant's guilt, I should concur without comment.  In this case, however, in view of the numerous assignments of error relating to alleged errors of the prosecuting attorney in propounding improper questions on cross-examination of the defendant, in asking other numerous improper questions of the state's witnesses, and in refusing the defendant the right to explain certain alleged admissions that the prosecutor contended defendant had made, including certain statements that he had made to his counsel with respect to his defense and the rulings of the court on these matters, I deem it my duty to say something concerning them.

Were it not for the fact that, in my judgment, defendant's own statements, in connection with the circumstances, are

conclusive of his guilt, and that the matters before referred to could not, in reason, have affected the minds of the jury in arriving at their verdict, I should concur in the affirmance of this judgment with some reluctance. The record in this case affords a striking illustration of how a prosecuting attorney, by becoming overzealous, may compel a reviewing court to reverse a judgment for errors that might and should have been avoided, where the evidence is otherwise sufficient to sustain the judgment. In this case, for instance, the prosecuting attorney insisted on requiring the defendant to disclose what communications he had made to his counsel respecting the alleged defense of insanity. This was a clear invasion of defendant's guaranteed constitutional privilege. Nevertheless, the district court sustained the contention of the prosecutor. Fortunately, however, the defendant was not prejudiced by the incident. Under different circumstances, however, he easily might have been, and we then would be compelled to reverse the judgment.

Again, defendant was compelled to state whether he had or had not made certain statements to a police officer while the defendant was in the latter's custody and which the prosecutor construed to be an admission of guilt, which, however, the defendant insisted was not such if explained, and he offered to make the explanation in connection with the statement asked by the prosecutor. The prosecuting attorney, however, refused to permit the explanation as offered by the defendant, and in that was again sustained by the court. While it is true that, ordinarily, when a statement is imputed to a witness on cross-examination and he admits the statement, an explanation may be deferred until the redirect examination is reached, yet when, as here, a statement which the prosecutor contends is in the nature of a confession of guilt, and which the defendant insists does not admit of that construction, if properly understood and applied to the surrounding circumstances, and he asks that he be permitted to make an explanation in connection with the statement, he should always be permitted to do so. If such is not permitted, the jury may not fully understand and appreciate the ex-

planation later made, and may construe the statement as an admission of guilt, while it may not be such at all. In this case, however, while I am clearly of the opinion that the court erred in sustaining the prosecutor's contention and in refusing to permit defendant to make the explanation in connection with the statement, the circumstances were again such that the defendant suffered no prejudice. Under different circumstances, however, prejudice might easily have resulted.

There are a number of other similar matters in this record, and I speak of them, and all of them, here only because I hope to avoid such occurrences in the future. Both court and prosecutor should remember that, when an accused testifies in his own behalf when he is on trial for his life, his nervous condition and state of mind are not always equal to the occasion, and in view of that the prosecutor necessarily has a great advantage over him. The latter, therefore, as well as the court, should be exceedingly careful not to abuse that advantage to the prejudice of the accused. The purpose of the prosecutor should be to convict only in case the evidence establishes the guilt of the accused beyond a reasonable doubt, and every opportunity should be afforded him to explain every inculpating circumstance if he can do so. This is especially true in cases of circumstantial evidence. The jury, which is ordinarily composed of intelligent men, will easily reconcile the evidence and give it its due weight and effect if properly guided by the court and their minds are not unduly influenced by an overzealous prosecution.

While the irregularities in this case are numerous, and in my judgment unnecessarily so, yet, upon the whole record, I am convinced that fortunately the defendant suffered no prejudice from them and that the jury could not conscientiously have arrived at a different verdict. Hence I concur in the affirmance of the judgment.

THURMAN, J. I concur in the opinions of my Associates Mr. Chief Justice WEBER and Mr. Justice FRICK. My only excuse for a separate statement is to emphasize my views respecting the phase of the case discussed by Mr. Justice FRICK.

The uncontradicted facts pertaining to the res gestæ together with the defendant's pretended explanation, and the admitted facts constituting the motive for the crime, were so conclusive of defendant's guilt as to absolutely relieve the case of every shadow of doubt. In fact, the only possible doubt that can be found in the entire case is as to whether or not the defendant had a fair trial. Even if it had been legitimate and proper to degrade him and hold him up before the jury as a vile wretch capable of every character of crime, it was wholly unnecessary to do so in order to procure a conviction. The questions and innuendoes resorted to for the purpose of degrading the defendant, in most instances, were neither proper nor legitimate. They related to matters so remote, irrelevant, and immaterial as to make it painfully obvious that the sole purpose was to prejudice the minds of the jury. Such methods of prosecuting a person charged with crime may have been permissible in the semibarbarous age of the English speaking people, but they are not permissible under the enlightened Constitutions of modern times, especially in the commonwealths of the great American republic. Many of the objections made by defendant's counsel were improperly overruled. In many instances he neglected to object when he ought to have objected, and in other instances he withdrew valid objections which he ought to have urged. The more flagrant of these instances have been referred to in detail by my Associates and need not be repeated here. While, ordinarily, it is the duty of the court to permit counsel for the litigants to try the case in their own way, yet there are instances in which it is the duty of the court even without the question being raised by counsel, to interpose in order to prevent injustice. Especially is this true where the constitutional rights of the defendant in a criminal case are involved. It is paradoxical to contend that, although an accused person has the constitutional right of being defended by counsel and of not being compelled to give evidence against himself, he may be compelled to disclose what he communicated to his counsel while preparing his defense. There is one thing that is of more importance to the people of the

commonwealth than the conviction of a particular person of crime, even though he may have actually confessed his guilt, and that is the preservation inviolate of every right guaranteed to him by the state or federal Constitution.

If this had been a close case on the facts, I would have felt it my duty to insist upon a reversal of the judgment on account of the manifest errors to which my Associates have specifically referred.

Before concluding, lest there be a misapprehension, it is only fair to state that Hon. James F. Ailshie, who so ably represented appellant before this court, did not participate in the trial of the case, and therefore is in no manner responsible for the proceedings in the court below.

### On Application for Rehearing.

WEBER, C. J. A petition for rehearing has been filed. Hon. James F. Ailshie, of Idaho, who made an unusually strong oral argument and whose brief on appeal covered every phase of the case, has reargued the issues. Hon. Thomas Marioneaux has also presented an illuminating brief. Both counsel disagree with our position, which is stated by Judge Marioneaux to be:

"In order to ascertain whether the error assigned upon appeal in a criminal case is prejudicial, the court will examine the testimony, and if it is clearly satisfied of the defendant's guilt, and is further satisfied that in the absence of the errors complained of the verdict of the jury would not have been different, such errors are not sufficient to call for a reversal of the judgment."

In our judgment the foregoing statement of counsel is too broad. As we view it, in order to hold an error harmless, this court should be satisfied that, in the absence of the errors complained of, the verdict of the jury should not have been different, and that as reasonable men, under the evidence, they ought not to have found any other verdict than that of guilty. The above may be said to be the general rule that has been well established in this jurisdiction, and particularly since the amendment of 1915 relating to the practice and procedure in criminal cases by which it is provided that—

"After hearing an appeal, the court must give judgment without regard to errors or defects which have not resulted in a miscarriage of justice. If error has been committed it shall not be presumed to have resulted in a miscarriage of justice. The court must be satisfied that it has that effect before it is warranted in reversing the judgment." Comp. Laws Utah 1917, § 9231.

Miscarriage of justice has been interpreted (*State* v. *Cluff*, 48 Utah, 102, 158 Pac. 701) to mean the deprivation of a substantial right. To deprive an accused of the right of jury trial, to compel him to be tried before a prejudiced jury, as was done in *Scribner* v. *State*, 3 Okl. Cr. 601, 108 Pac. 422, 35 L. R. A. (N. S.) 985, cited by counsel, and other errors that might be mentioned, would be the deprivation of such a right as would ipso facto compel a reversal, regardless of the amount and force of the incriminating evidence; but when applied to errors in instructions, errors in the exclusion and admission of evidence, where the excluded or admitted evidence is of such a nature that it ought not to have affected the minds of reasonable men, misconduct on the part of prosecuting attorneys, and such errors as are referred to in the opinion in this case, it is not error alone that authorizes this court to reverse a conviction, but, as stated in *Ford* v. *State* (Okl. Cr. App.) 212 Pac. 444, "error plus injury." Error that may be substantial in a doubtful case may be entirely insufficient for reversal when guilt is clearly proved. When error appears in the record, the burden is upon the defendant to show that he was wronged—that the defense was so much injured thereby or the prosecution so much strengthened that the verdict of guilty would probably not have been rendered had the error not been committed. To this effect have been numerous decisions of this court.

In *State* v. *Seymour*, 49 Utah, 285, 163 Pac. 789, it is said:

"It may also be the case that, although the court has erred in the particular now under consideration, yet the record may disclose that no prejudice resulted. Such is, however, not the case here. In this case the jury, upon the whole evidence, could well have found the defendant not guilty. The errors in the charge pointed out were therefore very prejudicial."

In *State* v. *Overson*, 55 Utah, 230, 185 Pac. 364, it is said:

"Were the evidence of guilt in this case so clear that no other

verdict than that of guilty could have been found in reason, we might possibly consider the instruction referred to as being erroneous, without being prejudicial to the defendant; but a careful consideration of all the evidence disclosed by the record convinces us that the instruction given was prejudicial to defendant, and that it probably prevented the jury from giving the evidence that fair and impartial consideration to which the accused was entitled."

The same thought is expressed in *State* v. *Nell,* 59 Utah, 68, 202 Pac. 7, where it is said:

"No hard and fast rule can be invoked as to when error is prejudicial. It depends upon the circumstances of each particular case. What may be prejudicial error in a case in which the evidence for the state is not strong—in what is sometimes termed a 'close case'—may be entirely harmless and without prejudicial effect when the evidence of guilt is clear and convincing."

In *State* v. *Siddoway,* 61 Utah, 189, 211 Pac. 968, it is said:

"A careful consideration of all the evidence compels the conclusion that the result in this case could not have been otherwise, regardless of the errors assigned."

Referring to the statement in the opinion in this case that "error, when it occurs in a criminal case, is not presumed to be prejudicial in this state," Judge Ailshie says in his brief accompanying the petition for rehearing:

"Apparently the cases in which the court has considered the rule of presumptions has taken this advanced, if not extreme, position, that the court will presume that no prejudice resulted, have been cases of sentence to imprisonment only."

The doctrine criticised is in effect enunciated in *State* v. *Thorne,* 41 Utah, 414, 126 Pac. 286, Ann. Cas. 1915D, 90. See, also, 17 C. J. p. 272, § 3600.

It is urged by counsel that the constitutional rule is that an appellate court has no authority to weigh the evidence in any case or for any purpose except to see, where a verdict of guilty has been rendered, that there is substantial evidence in the record on which it may rest.

If we are to follow our own decisions, as well as those of at least one-half of the American courts of last resort, how are we to ascertain whether error is prejudicial without an examination of the record? It is not for the purpose of the determination of defendant's guilt that the rec-

ord is examined, but to determine whether the alleged
error has, as a matter of law, deprived the defendant of a
substantial right, to his injury. Have we a right to examine
the record and weigh the evidence only when the result will
be in favor of the accused?

"On what argument is it shown that it is perfectly proper, in
an administrative point of view, to weigh every particle of the
evidence for the purpose of setting aside a verdict, and, at the
same time, impossible to estimate the probative force of the par-
ticular piece of evidence improperly admitted or excluded, for the
purpose of seeing that it is not necessary to nullify the verdict?"
1 Chamberlayne, Modern Evidence, § 325, p. 421.

Many, though not all, appellate courts do examine evidence
in criminal cases for the purpose of ascertaining whether any
misdirection of the jury or the improper admission or rejec-
tion of evidence has resulted in a miscarriage of justice. In
*Brown* v. *State,* 9 Okl. Cr. 382, 132 Pac. 359, a murder case,
it is said:

"In view of the entire record in this case, the testimony of
appellant was a libel on common sense and reason and was prop-
erly rejected by the jury. Appellant's evidence was simply un-
believable. We therefore find, from an inspection of the entire
record, that appellant was not and could not reasonably have been
injured by the error in the charge of the court above complained
of."

In *Allen* v. *State,* 13 Okl. Cr. 395, 164 Pac. 1002, L. R. A.
1917F, 210, another murder case, the court says:

"Where the evidence is so conclusive and convincing of the guilt
of the defendant of the degree of crime of which the jury found
him guilty, before this court may set such a judgment of convic-
tion aside it must clearly appear that the defendant has been
deprived of some constitutional or statutory right, or that the
errors complained of have probably resulted in a miscarriage of
justice. In this case, it is our firm conviction, not only that there
has been no miscarriage of justice, or that the defendant has been
deprived of any of his constitutional or statutory rights, but also
that the conviction of murder received at the hands of the jury
was the only honest verdict which an intelligent and unbiased
jury could have found under the evidence."

In *People* v. *Nakis,* 184 Cal. 105, 193 Pac. 92, also a murder
case, it is said:

"After a careful review of the evidence adduced upon the whole

case, we are of the opinion that the verdict found by the jury was not the result of prejudice and was uninfluenced by any of the errors or irregularities complained of. *People* v. *Lawlor*, 21 Cal. App. 63, 131 Pac. 63."

California has a constitutional provision similar to our statute regarding errors occurring during criminal trials. In *People* v. *Lawlor*, 21 Cal. App. 63, 131 Pac. 63, it is said:

"While this provision of the Constitution is far from being self-explanatory of its scope and effect, and although it has never been construed and applied by our Supreme Court, plainly the purpose of its adoption was to expedite and make certain the administration of justice by rendering of no avail, upon appeal to this court, errors occurring during the trial of a criminal case, either in the charge of the trial court or as to any matter of pleading or procedure which cannot be fairly said, upon a review of the evidence in the entire case, to have resulted in a miscarriage of justice. In other words, the rule formerly in vogue that prejudice is presumed to have resulted to a defendant from any substantial error or irregularity occurring during the course of a criminal trial has been effectively abrogated by the constitutional provision under consideration, which, as we read it, declares that, where error or irregularity appears in the conduct of a trial, it is the duty of the appellate court to examine the evidence upon the whole case, and, if possible, ascertain therefrom whether or not the error or irregularity complained of did in fact operate to the injury of the defendant to the extent that it may be justly said that his conviction was a miscarriage of justice. In order to comply with the mandate of the Constitution, there is no escape from the conclusion, it seems to us, that we are called upon and compelled to weigh the evidence upon which the conviction was had, and then decide whether or not the error or irregularity complained of had the effect indicated. If these views be correct, then it must follow that where, in any given case, it appears to the satisfaction of this court, from a reading of the evidence adduced upon the whole case, that the verdict found by the jury was just, and would have been the same notwithstanding the error or irregularity complained of, a new trial will not be ordered."

Our position is sustained by the preponderance of modern authority, both American and English, and it is useless to cite further authorities.

Counsel criticise the statement in the opinion relating to the testimony of the witness Zimmerman and its effect upon the jury. We appreciate the force of the criticism and confess error in that regard. As the statement in no way af-

fects nor can affect our conclusion, it will be eliminated from the opinion and will be omitted from the official opinion as published.

It is contended with much plausibility that it cannot be presumed that, if no error had been committed by the trial court and the improper evidence had not been allowed, the jury would have all agreed on inflicting the death penalty. As we stated in the opinion, the evidence of defendant's guilt is conclusive. Not a single mitigating circumstance appears in the record. Only maudlin sentimentality could induce any juror convinced of defendant's guilt to favor clemency. It is true, a juror may arbitrarily and without reason oppose the infliction of the death penalty upon a defendant whose guilt of murder in the first degree has been established, but he cannot rightfully do so without some substantial reason.

Defendant was guilty of an atrocious murder—one of the most brutal in criminal history—and we are unable to conceive how the jury could have recommended a miti-    **13** gation of the extreme penalty though the record had been free from flaw or error. As said in *People* v. *Rollins,* 179 Cal. 793, 179 Pac. 209:

"It has several times been held that the discretion given to the jury to provide for life imprisonment in such a case is not an arbitrary discretion to be exercised without regard to the circumstances of the particular case, but only where it appears to the jury that there is some circumstance that warrants or justifies the imposition of the lesser punishment. Of course, the conclusion of the jury on such a matter is final, but the provision under discussion contemplates that the state shall have jurors who are not so bound by conscientious opinions as to capital punishment that they will be unable to act as the circumstances of the case demand in view of the law."

In *State* v. *Mewhinney,* 43 Utah, 135, 134 Pac. 632, L. R. A. 1916D, 590, Ann. Cas. 1916C, 537, it is said by Mr. Justice Frick:

"Finally it is contended that the court erred in its charge to the jury with respect to their right to recommend life imprisonment in case they found appellant guilty of murder in the first degree. The court, in calling attention to the statute upon that subject which confers the right upon the jury to recommend life imprison-

ment in case they find appellant guilty of first degree murder, charged as follows:

" 'In considering this question you are not restricted by any rule of law or public policy, but are entitled to decide the question from such considerations as may appeal to you as reasonably and conscientiously entitled to be weighed in determining the giving or withholding of such recommendation.'

"It is contended that this charge is open to the same objection as the one which we condemned in the case of *State* v. *Thorne*, 39 Utah, 208, 117 Pac. 58. This contention is not tenable. The court in this case in no way did, nor attempted to, direct or control the judgment of the jury in arriving at a conclusion upon the question of recommendation."

Every member of this court has given careful and painstaking consideration to all the questions urged upon the appeal and in the argument for a rehearing. Our conviction is that the competent evidence admitted in the case, notwithstanding the errors complained of, conclusively shows that the jury could not consistently have reached a different conclusion. The denial of a new trial by the district court was not an abuse of discretion. The petition for rehearing is denied.

GIDEON, THURMAN, CHERRY, and FRICK, JJ., concur.