# STATE v. HORR.

No. 4031.    Decided December 13, 1923.    (221 Pac. 867.)

1. CRIMINAL LAW—SUPREME COURT MAY CONSIDER WEAKNESS OF
   EVIDENCE IN DETERMINING WHETHER ERROR PREJUDICIAL. In a
   criminal prosecution the Supreme Court may consider the weak-
   ness of evidence which on its face is manifestly improbable in
   determining whether a case is so close and doubtful as to ren-
   der it probable that error was prejudicial.[1]

2. ARSON—DISCREPANCY BETWEEN VALUE OF PROPERTY AND INSUR-
   ANCE THEREON COMPETENT TO PROVE MOTIVE. In a prosecution
   for arson, testimony that the value of the property destroyed
   was much less than the value at which defendant had it in-
   sured is competent to prove motive.

3. ARSON—EVIDENCE IN REBUTTAL AS TO VALUE OF PROPERTY DE-
   STROYED HELD PROPERLY EXCLUDED. In a prosecution for arson,
   where the district attorney in rebuttal offered evidence that the
   value of the property was about one-sixth of the amount of in-
   surance thereon, such evidence was properly excluded where it
   did not appear that the property was in the same condition
   when examined as it was at the time of the fire.

4. CRIMINAL LAW—CONDUCT OF DISTRICT ATTORNEY HELD NOT TO RE-
   QUIRE REVERSAL IN ARSON CASE. In a prosecution for arson,
   that the district attorney stated that he would prove that the
   value of the property burned was about one-sixth of the amount
   of insurance, and offered proof of such fact incompetent be-
   cause it was offered in rebuttal instead of in chief, held not, in
   view of cautionary instructions, to require a reversal.

5. CRIMINAL LAW—IMPROPER FOR DISTRICT ATTORNEY TO ACCUSE
   WITNESSES OF LYING. It is improper and reprehensible for the
   district attorney in all cases, either during the taking of testi-
   mony or in the argument, to accuse a witness of lying.[2]

6. CRIMINAL LAW—ARGUMENT OF DISTRICT ATTORNEY HELD TO RE-
   QUIRE REVERSAL IN ARSON CASE. In a prosecution for arson,
   where the evidence was close, it was ground for reversal that
   the district attorney in his argument stated that in his experi-
   ence he had seen juries bring in verdicts of guilty on less favor-
   able testimony to the state; such statement being a direct ap-

[1] State v. Woods, 62 Utah, 397, 220 Pac. 215, distinguished.
[2] State v. Coyle, 41 Utah, 320, 126 Pac. 305.

peal to the jury to consider matters outside of the evidence in the case.

CHERRY, J., dissenting.

Appeal from District Court, Third District, Salt Lake County; *G. A. Iverson,* Judge.

J. H. Horr was convicted of arson in the second degree, and he appeals.

REVERSED and REMANDED, with directions.

*S. A. King* and *John F. Tobin,* both of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal. Farr,* Asst. Atty. Gen., for the State.

THURMAN, J.

The defendant was convicted of the crime of arson in the second degree in the district court of Salt Lake county, and sentenced to an indeterminate term of imprisonment in the State Prison.

The information contained two counts. The first charged arson in the second degree. The second charged the burning of certain household furniture insured for the sum of $1,200, with intent to defraud the insurer. The defendant pleaded not guilty. At the beginning of the trial, on motion of the district attorney, the second count of the information was dismissed, and the trial thereafter prosecuted on the count for arson in the second degree. The jury to whom the case was tried found the defendant guilty. Motion for a new trial was denied, and sentence rendered by the court, from which sentence defendant appeals.

The errors relied on by the defendant are misconduct of the prosecuting attorney, erroneous admission of evidence, erroneous instruction to the jury, refusal of requests to in-

struct, insufficiency of the evidence to sustain the verdict, and denial of defendant's motion for a new trial.

The evidence is almost entirely circumstantial, and in many respects conflicting. The fact that a large portion of the furniture and some parts of the building were burned, and that it was a work of an incendiary, is not in dispute. The ultimate question to be determined is: Did the defendant set fire to the property?

Before considering the alleged errors assigned by defendant it is necessary to make a reasonably full statement of the facts. There are many facts beside the burning of the property by an incendiary that are not in dispute. We shall refer to these before noting the conflict in the evidence.

Prior to April 1, 1922, defendant resided in Murray, Salt Lake county. He had two sons, the elder, Orley, About 17 years of age, and the younger, George, about 9. The defendant had been married twice, and both of his wives were dead. Orley, the elder son, was issue of the first marriage, and George issue of the second. The last wife died leaving to George considerable property; among other things, household furniture, etc. In April or May (the evidence is not clear), 1922, the defendant with his boys moved from Murray to a house No. 358 Reed street, in the northwestern part of Salt Lake City. The furniture and household goods at the time of the move consisted of three wagon loads on a flat-bottomed hay rack as described by the witness who did the hauling. The same witness also described the furniture as a piano, bedsteads, bedding, dressers, "and the like;" also a number of parcels containing unknown, books, rugs, carpets, cook stoves, "lots of chairs"; also a table. Early in May, 1922, after moving to Salt Lake City, the defendant had the furniture insured. The value at which it was insured was fixed at $1,200. He was guardian of George, and claimed that the furniture belonged to him, and was insured in his behalf. As to this there is some dispute, but there is little or no evidence against his contention in that regard.

A short time after removing to Salt Lake City the defendant engaged the services of a Mrs. Quinn, who had been

employed by him before, to keep his house and take care of his boys. This employment continued for some two or three months, but as his income was insufficient to pay for her services, she left his home and moved to a home on First West street, and within a short time thereafter moved to Almond street, Salt Lake City, and still continued to care for the defendant's elder son. On or about October 6th Orley left home and started for California. On the same day defendant, who had procured a job of carpentering in the near vicinity of Mrs. Quinn's home, moved there temporarily with his younger son, and was lodging and taking his meals there, when the fire occurred, October 11, 1922, which is charged as arson in this proceeding. After moving to Mrs. Quinn's it appears from the testimony of defendant, and is not disputed, that defendant went to his home on Reed street every evening to get his mail, including the evening of October 10th, the night before the fire, when, as he says, he went there about 8:30 and remained for half an hour. At 2:30 the next morning the building was discovered to be on fire. The fireman, being called, appeared on the scene and extinguished the fire, but not until considerable damage had been done to the building and furniture. The firemen discovered rags, clothing, and paper scattered about the rooms, saturated more or less with kerosene, and smelled the odor of kerosene on the rags and clothing. The front door of the house had to be broken open by the firemen. A gasoline can half full of gasoline was discovered in one of the rooms. A five gallon can containing a little oil was found, and a two-gallon can partially burned was also discovered. A lady living in the immediate neighborhood testified that at about 8:30 p. m. on the evening of October 10th, while passing in the vicinity of defendant's home, she smelled something like coal oil rags burning. She could not tell whether the odor came from defendant's home or not. Her mother was with her, and drew her attention to the odor. Another lady living in the next house only a few feet away, at about 8 o'clock on the same evening noticed that the window blinds of defendant's house were pulled down—something she had never observed before. She observed also there was a light in the house. Another

witness testified that on the evening of October 9th the defendant called at her house and borrowed some matches, saying, ''When my son is at home he smokes nearly all the time.'' The same witness also testified that about a month before the fire, when 'defendant's son moved away, she saw a small van take away a couch and something that looked like a dresser. It appears also that defendant purchased two gallons of coal oil on October 9th at the Apple Street grocery, in the near vicinity of Mrs. Quinn's home. The defendant brought a cylinder-shaped can which came up to a point at the top. It was similar in shape and appearance to one of the cans found at defendant's home when the fire occurred. It also appears that two or three days before defendant purchased the oil he was at the same grocery inquiring the price of oil, and whether it would be cheaper if he bought in larger quantities. It also appears that since the fire defendant made demand for the insurance.

The foregoing facts and circumstances are not in dispute. They are treated by the writer as admitted facts. There may be others of more or less significance which are not in dispute. If so, they will be noted before concluding our statement of the case.

In the following matters we give the version of the state's witnesses, omitting, as far as convenient, the repetition of facts already stated.

Herbert Leichter, a deputy sheriff of Salt Lake county, as a witness for the state, testified in substance that he arrived at the scene of the fire early in the afternoon of October 11th, and examined the premises. He was accompanied by other officers, and together they examined the condition of the property. The odor of coal oil was very distinct. He found that nearly everything inside the house was destroyed. (We omit detailed description, because, as stated above, there is no doubt that the burning was the work of an incendiary.) The defendant arrived at the building about the time the witness concluded his examination of the premises, and probably before. Witness asked defendant if he had borrowed any matches in the neighborhood the night before, and the witness said, ''No; he never borrowed any matches.'' Later

witness asked him if he had not borrowed some matches from
a lady occupying "this particular house," and pointed at a
house in the neighborhood. Defendant said, "Oh, yes; I bor-
rowed some in there Monday night." Witness asked him
if he still lived there, and defendant said "No," that he had
moved away the Friday before up to 261 Almond street,
where he had procured a job, and he wanted to be near his
work. Defendant said he was occupying a room adjoining
the room occupied by Mrs. Quinn, who was taking care of his
9 year old son; that he came down to the place, 358 Reed
street, nearly every night to get his mail, which was still
being delivered there; that he came down Saturday night
and Sunday evening and played the piano, and Monday
evening he came principally to take a bath. He discovered
he had no matches, and went and borrowed them. Witness
says he asked defendant if he had purchased any coal oil re-
cently, and defendant said "No;" that he had not purchased
any coal oil for months. Witness also asked defendant if
he had moved any furniture from the place, and defendant
said he had not. Defendant admitted to the witness that he
had pulled down the front window blinds on Tuesday even-
ing. Defendant told witness he came down to the place
Tuesday evening about 8 o'clock and remained until shortly
before 9.

Defendant was arrested and put in jail. The next day,
while in the county jail, witness asked defendant if it was
not a fact that he purchased two gallons of coal oil at the
Apple street grocery on Monday before the fire, and witness
said he had forgotten all about that particular coal oil, or
he would have told witness about it. Defendant said he had
been worrying about it; that he had bought it to kill bed-
bugs. When asked where the coal oil was, defendant said it
was standing in the coal shed that belonged to a room occu-
pied by Mrs. Quinn on Almond street. He said he put an
ounce or two of corrosive sublimate in it, and that it was
standing there by the coal shed. He said it was in a cylinder-
shaped can which he had found in the vicinity of 261 Al-
mond street several days prior to purchasing the oil. At
this point it may be mentioned that considerable testimony

was introduced to show how the can came to be at the place where defendant found it, but its materiality does not appear.

R. H. Giles, a deputy sheriff of Salt Lake county, testified in substance that he and another officer went to 261 Almond street after the fire to look for a coal oil can that was supposed to be there. They failed to find a coal oil can, but found a cylinder-shaped can between the coal shed and south end of the house. The can did not contain any coal oil. Witness smelled it, and it "smelled of a licorice compound." He examined the premises for other cans and found none.

Mrs. Hazel Putnam, a witness for the state, who testified to seeing defendant move a couch and dresser from No. 358 Reed street about a month before the fire, also testified that she saw him remove a load of wood, which might have been kindling, about two weeks before the fire. He also removed a kitchen stove about a week after removing the wood. He brought back an old sanitary couch and two or three odd pieces to which witness paid no particular attention.

The foregoing is substantially the state of the evidence as it existed when the prosecution rested. Defendant moved for a directed verdict on the ground that there was no evidence to connect the defendant with the burning of the property. The motion was denied.

The evidence for the defendant, except as appears in the undisputed facts above set forth, is in substance as follows:

O. C. Adams, witness for defendant, testified he was a conductor for the street railway company on the night of October 10, 1922; that he had known the defendant for several years; that his run as conductor was from Warm Springs to Sugar House; that on the night of the 10th of October he left Warm Springs at 9 o'clock; that defendant boarded the car at Seventh North and Second West; that defendant told him he lived at 261 North, West Temple street, and got off at that place; that while defendant was on his car they had a conversation concerning the health of witness' wife; that he gave defendant $5 to purchase medicine; that the money was afterwards returned to him. The witness further stated that defendant was carrying a sack which he said contained clothing. He said he had been down

to 358 Reed street to get some clothing to have washed. Defendant got off at West Temple and First North.

E. L. Horr, brother of defendant and witness on his behalf, testified that his mother, some time before her death, gave Orley, defendant's son by his first wife, some furniture. He remembered a bureau and sanitary couch. There were other articles which he did not remember. After his mother died in June, 1922, the furniture was moved to defendant's home on Reed street.

Mrs. Bell Quinn, for defendant, testified she resided at 261 Almond street, Salt Lake City, and was acquainted with defendant and his boys; she had kept house for him on Reed street from April till August, 1922, when she moved to Almond street. Orley went with her. Defendant commenced to take his meals at her place on October 6th. On the evening of the 10th defendant was at her residence on Almond street for supper. After that he went down and got his mail. When he returned about 9 o'clock she had just gone to bed. She was ill, but heard him coming in. He then told her he was going out to phone. When he returned he said he had found a phone, but did not get the party he wanted. He was phoning to get medicine for Mr. Adams' wife. He left $5 there to be returned to Mr. Adams, and witness returned it. Witness was sick all night, and did not sleep well. If defendant had left the house after he returned from phoning witness would have heard him. During the night defendant waited on her and gave her cough medicine twice. The first time it was about 2 o'clock. The little boy slept with his father. He went to bed a few minutes after 9. He had to get up after that. He usually had to get up about 12 or 1 o'clock every night. Witness knew of some furniture being moved from defendant's residence on Reed street to her place before moving to Almond street. It was a dresser, one rocking chair, two stool chairs, and an old dining table and couch. The dresser and couch belonged to Orley. Witness still has the property. She exchanged cook stoves with the defendant. His did better baking. That was before the fire. The stove she traded him was taken to his place on Reed street. Witness has known Orley for several years.

He lived with her in Idaho. He is about 17 years of age. She knew of defendant's accepting an agency to sell a lamp called Aladdin lamp. It burns coal oil. She had a conversation with defendant about getting coal oil to kill bedbugs that were in the woodwork of the back room. She talked to him about it when she first moved to the place, and thought she talked with him on Sunday before the fire.

On cross-examination certain impeaching questions were propounded by the state's attorney. She denied categorically that at the preliminary examination she testified she had no way of telling whether defendant had occupied his bed between 10:30 p. m. and 3:30 a. m. of the night of the fire. She also denied telling Giles and Vandike that there had never been any bedbugs in the house. She admitted she had not seen any coal oil on the premises. She said she could hear defendant snoring every night, and heard him on the night in question. In leaving his room he would have to pass through her room, unless he went out through the coal room, but he was always in the habit of passing through her room, the other means of exit being locked up. He could not have left that night without her knowing it, for she was nervous and awake "off and on." It is about a mile from her home to defendant's home on Reed street. Defendant had this job there, and she was keeping the boy George, so defendant asked if he could board and lodge there while the job lasted. His work was about 250 or 300 yards from witness' home. In answer to an impeaching question witness denied that in conversation with Deputy Sheriffs Leichter and Giles at the sheriff's office on October 11th she told them that she went to sleep about midnight on the night of the fire and never awoke until towards morning by hearing defendant walk in the adjoining room. She also denied saying that if defendant set the house on fire it must have been after 12 o'clock, as she went to sleep about that time. In answer to further cross-examination witness said she conversed with defendant relative to getting coal oil to kill bedbugs on Sunday morning before the fire. He spoke of getting coal oil and something to mix with it. Witness did not re-

member the ingredients. Witness also denied telling Leichter and Giles that she never had bedbugs in her house.

George Horr, son of defendant, testified in behalf of defendant. He stated he was 9 years old, and had been living with his father on Almond street only a few days when the fire occurred. They arrived there on Friday, October 6th, and the fire occurred October 10th, during the night. Witness said his father was at Almond street on that night. His father was at work during the day just down the hill for Mr. Hansen. Witness was at home that evening when his father came from work. He had his dinner there, and after that went down to the residence on Reed street. He returned home about 9 o'clock. Witness let his father in the house. He had a bundle of dirty clothes. He put $5 in the dresser dish in the front room, and asked Mrs. Quinn if there was a phone in the building. She said she did not know. He said he had to phone, and went out. He was gone 10 or fifteen minutes and came back. Witness was in bed, but had not gone to sleep. Witness went to sleep, and his father came to bed. Witness had to get up to the vessel, and the clock was on the chair by his bed. It was a few minutes after 1 o'clock. Witness said he had to get up that way every night. On this occasion he had to crawl over his father, who was in bed. Mrs. Quinn was sick. Witness heard her coughing. His father got up at about 2 o'clock, turned on the light, and got some medicine for Mrs. Quinn. His father brought some coal oil. Witness saw it in the coal shed. He didn't know when it was brought. It was two or three days before the fire. Witness did not know what became of it.

On cross-examination the witness was asked if on the 11th day of October he did not tell Mr. McCarty, county attorney, that on the night of the fire, at about 9 o'clock that night, he (witness) was ready to go to bed when his father came home, and that he went to bed, and his father left the house telling witness to lock the door. The witness answered: "No, sir. He never said to lock the door. He just went out. He said he was going to phone." In answer to a further question witness said he did not think he told them that he latched the screen door when his father left and turned out

the lights and went to bed. Being further interrogated as to whether he had not stated that he then fell asleep and did not remember when his father returned, witness answered: "Yes; but you had me scared, and I did not know what I was saying." The witness further stated that no one had told him what to say and that he had been told by the attorneys to tell the truth.

The defendant testified in his own behalf. Omitting, as far as possible, facts about which there is no controversy, his testimony in substance follows: His furniture moved to Reed street consisted of a piano, rugs, chairs, dining tables, book cases, clothes chests, commodes, astrological books, libraries, cook stoves, kitchen furniture, dishes and general furnishings for a house. His mother died in May, 1922. His son Orley came after her death in June. After her death some of her furniture—a red plush couch, a dresser, rocking chair, and some other little keepsakes—belonged to Orley. These articles were moved to defendant's home, 358 Reed street, after the other furniture was insured. Defendant moved with his son George to Mrs. Quinn's place on Almond street October 6, 1922. He had a job of carpentering in that vicinity. He arranged with Mrs. Quinn to take care of George and board defendant also. Orley had been living with Mrs. Quinn for over a month. He started for Los Angeles on October 6th. Defendant and George continued to live at Mrs. Quinn's. Defendant went down to his home on Reed street every night. On Monday night he went to a near neighbor to borrow matches to light the stove for a bath. There were no facilities for bathing at Mrs. Quinn's. When he got the matches he found there was no kindling and coal to make a fire. He did not know it was all gone when he borrowed the matches. He concluded he would take his bath up town next day. On October 10th he worked for Mr. Hansen, quit at 5 o'clock, went to Mrs. Quinn's, ate his supper, washed, and went on the Warm Springs car to his home on Reed street. He arrived there about 8 o'clock and remained a half or three-quarters of an hour. He gathered up some dirty clothes for washing at Mrs. Quinn's. She had requested him to bring it. He took the street car at Seventh North (Reed

street) and Second West and rode to First North and West Temple. Conductor Adams was running the car. Defendant had a conversation with him about his wife's health. As a result Adams gave him $5 to fix some blood medicine for his wife. When defendant left the car he went to Mrs. Quinn's. Mrs. Quinn had retired, but George unlocked the door and let him in. Defendant said to Mrs. Quinn. "Here is the washing," and asked her if there was a phone in the house. She said she did not think so. Defendant said, "I have got a phone." Defendant found a phone, and tried to get a Mrs. Stewart, but failed, and returned to Mrs. Quinn's. He had been gone 10 or 20 minutes. He was not away from the house after that during the night. He was up three times. The first time he got medicine for Mrs. Quinn and rubbed her chest for bronchitis trouble. The second was on account of the boy. He though he was ill. The third time was further treatment of Mrs. Quinn. Defendant first heard of the fire at his home on Reed street about 10:30 or 11 o'clock on the morning of the fire. He was working at the time for Mr. Hansen. He first went to Mrs. Quinn's and dressed his hand, which had been injured by falling, then went down to Reed street. Arriving there he saw some people drive up in a car. He walked to them, and saw it was Mr. Leichter. Defendant then relates the circumstances of purchasing coal oil at the Apple street grocery on Monday night before the fire, describing the can he took for the oil, and that his attention had been called to some cans lying near Apple street by a Mr. Jones. He picked up one of the cans and took it to get the oil. He purchased the oil to exterminate bedbugs and also for a lamp for which he was agent at the time. He had not received the lamp, but had been expecting it for over a week. He received notice the lamp had come about 10 minutes after he was arrested, and later got two of the lamps. The notice came by post, and was received while he was there at the Reed street place on the 11th. He took the oil and put it in the entrance to the coal shed adjoining Mrs. Quinn's place. Mrs. Quinn was dressing to go to a Mr. Hill's residence, and he set it there until she got through dressing. He never recovered

the can after. He saw it there the morning of the 10th as he went to work, and has never seen it since. Defendant said he had no gasoline, coal oil, or heavy oil at his Reed street home, and never took any oil there at any time or on any occasion. He stated he never poured coal oil or gasoline, or anything else, on paper, rags, or clothing, or any place in the building, nor made any fire in the building on that occasion, or left any instruments or anything else that would start a fire. Nothing of that kind was done with his knowledge, consent, or approval. He did not know how the fire started. While he was there on the 11th he had a conversation with Mr. Leichter. Leichter inquired whether defendant ever had any coal oil there at that place. Defendant said, "No, sir; never a drop on the place." Leichter did not ask him at that time if he had bought oil at the grocery store. Later, after defendant was incarcerated, Leichter asked him about that purchase, and he answered, "Yes." Leichter also asked him if he had borrowed matches "last night" at a certain designated place. Defendant said, "No"; admitted, however, that he borrowed some there on Monday night. At the county jail defendant told Leichter what he purchased the oil for and what he did with it. At that time Leichter accused him of setting fire to the place, and told him he was going to get a long term; also told him they had the very tin can with defendant's finger prints on it. Defendant said "For God's Sake, hold them, and we will see whose finger prints they are and they will not be mine!" Leichter also said, "Mrs. Quinn has squealed everything." Defendant said, "You are a dirty liar, and if you were outside of this place I would make you take it back. Mrs. Quinn never told you any such thing." When they were on the premises October 11th Leichter said "Horr, this looks like the work of a lot of boys. Where was your boy last night? Defendant said he was on his way to California, and Leichter did not believe it. Defendant told Leichter that he had received a letter from him at Reno, Nev. Defendant said the furniture he had insured, outside of some books, belonged to his son George. It had formerly belonged to the boy's mother. She died January, 1921, and defendant

was appointed George's guardian, and is still acting in that capacity. The boy also has property at Price consisting of farms, residential and other property. A Mr. Shaw was the gentleman to whom defendant applied for insurance. He knew that defendant was the boy's guardian, and that the property belonged to him. On cross-examination defendant was asked concerning the value of the property at the Reed street home, and answered it was over $2,000. Defendant was then asked if he had not stated at the preliminary hearing that the furniture was "up to the value of $500." The witness answered: "—and that the other stuff that we had there was over $750, and produced the proof before Judge Johnson." "Q. Didn't you stipulate that the property in that place, personal property, was not worth in excess of $500? A. I said the furniture— Q. Answer that question. A. Well, I am answering it, if you will let me. Q. I am asking you concerning all the personal property. A. All the personal property? No; I had over $2,000." Defendant testified he told Mr. Shaw that it was his son's property that he was insuring; that he wanted a little insurance, $500 or $600, on it; and he (Shaw) asked defendant, "Why don't you take out somewhere near the value? It will only cost you a little more. Look at what you possess here, with the other things." Defendant then had the property insured at $1,200. Defendant never told Mrs. Quinn about purchasing the coal oil till he was in jail. He couldn't take the coal oil through Mrs. Quinn's rooms to his own because she was dressing. He could not go through the south door because it was always kept bolted and thumb-latched. Defendant was asked by the state's attorney concerning an alleged conversation with one C. F. Holman in November, 1921, to the effect that defendant told Holman the furniture in his house was old; that it was not worth freight charges in the event he shipped it to Los Angeles; that defendant was shy about $150 and the best way to raise the money was to insure the furniture and burn it. Defendant answered: "No, sir! No, sir! That is false." Defendant's attention was called to the oil can that had been partially burned in the fire and asked if that was the can he purchased the oil in. He answered: "No,

sir It was no such shape.'' He said it was similar in size.

Herbert Leichter, for the state, was called in rebuttal, and testified that Mrs. Quinn, at the county jail, on October 11th, in the presence of Ray McCarty, of the county attorney's office, and Dick Giles, stated that she had no way of telling whether the defendant had occupied his bed or room at all between the hours of 10 p. m. and 3:30 a. m. of October 10th and early morning of October 11th. Mr. Leichter also testified that the boy George Horr, on the 11th day of October, at the county jail, in the presence of Ray McCarthy, Sheriff Emery, Dick Giles, and witness, stated that on the night of October 10th, about 9 o'clock, he was ready to go to bed when his father came home; that he went to bed and his father left the house telling him to lock the door; that he (George) latched the screen door as his father left, turned out the light, and went to bed. The witness also testified that Mrs. Quinn told him that, if Mr. Horr burned the residence at Reed street, he must have done so after 12 o'clock on the night of October 10th.

Charles Holman, for the state, in rebuttal testified that in the month of November, 1921, he lived at defendant's residence in Murray, and at that time in a conversation defendant told him that the furniture in his house was old and out of date, was not worth freight charges to Los Angeles, and the only way to get any money out of it would be to insure it and burn it. On cross-examination by defendant's counsel witness said there was no bitter feeling toward defendant on his part, but admitted he had nothing to do with him, and that they did not speak to one another.

Ray McCarty, assistant county attorney, in rebuttal for the state, corroborated Herbert Leichter as to the alleged statements of the witness George Horr.

The condition of the record is such as to render it impracticable to make a more condensed statements of the facts.

Whether or not the defendant set fire to the premises in question depends entirely upon circumstantial evidence. Upon that feature of the case the court, among other suitable instructions, instructed the jury as follows:

"If the circumstances, when considered all together, are explain-

able upon any reasonable hypothesis other than that the defendant is guilty, you should acquit him."

Appellant's counsel earnestly insist that every circumstance apparently incriminating is susceptible of an explanation consistent with defendant's innocence.

As to the contention that the defendant had the property insured at a sum greater than its insurable value, it must be conceded there is no competent evidence to sustain such contention. During his opening address to the jury the prosecuting attorney stated he would prove that the property insured was not worth exceeding $200. The statement was entirely proper, for such proof, if available, would show some motive for burning the property. But no proof whatever was offered in chief to support the statement, and on cross-examination of defendant his testimony considered as a whole showed that the entire personal property in the building at the time of the fire was of the value of over $2,000. Furthermore, it appears from defendant's cross-examination that he only wanted $500 or $600 insurance upon the property, but the agent from whom he bought the insurance asked him why he did not have it insured at something near its value, and that they finally fixed the value at $1,200. For some reason not appearing in the record the agent referred to—a Mr. Shaw—was not called in rebuttal; so that the evidence as to the value of the personal property stands in the record as above set forth.

The contention that a small portion of the furniture was moved from the premises to Mrs. Quinn's residence about a month before the fire is explained by the fact that it belonged to defendant's son Orley, as a gift from his grandmother, and that Orley was living at Mrs. Quinn's. The furniture consisted of an old sanitary cot, a dresser, and one or two other articles. The moving of some wood from the premises, which the witness admitted might be kindling, a few days before the fire, is explained by the fact that the defendant himself, with his younger son, George, was moving to Mrs. Quinn's about that time. Defendant's explanation as to why he moved to Mrs. Quinn's was that he had a job of work near her residence, and he went there to lodge and board temporarily

State v. Horr, 63 Utah 22

while the job lasted. His explanation as to why he was at the Reed street building from shortly after 8 o'clock Tuesday evening until nearly 9 was that his mail was still being delivered there, and he had gone down every evening after moving to Mrs. Quinn's to get his mail. He admitted pulling down some of the window blinds, and also that the house was lighted. No special reasons are given for pulling down the blinds, nor is it easy to conceive that the circumstance should be considered as incriminating, especially in view of the fact that defendant was temporarily residing elsewhere. The fact that the odor of coal oil and rags burning was detected about the same time by persons in the vicinity would be strongly incriminating if the fire had broken out shortly thereafter. But it was 5 or 6 hours after the odor was detected before the building was discovered to be on fire. The whole trend of the evidence and the examination of witnesses by the prosecuting attorney clearly indicate that his theory was that the fire was started at some time after 12 o'clock midnight on the night of October 10th. Indeed, considering the inflammability of the material used by the incendiary, it is difficult to conceive how the fire could have smoldered for a period of 6 hours before breaking out, as shown by the evidence.

The fact that defendant borrowed matches on Monday night before the fire, saying that when his son was home he smoked nearly all the time, can hardly be considered an incriminating circumstance, even if his son three days before had started to California. It will be remembered that the son referred to started to California on Friday before the fire. That very day defendant and George moved to Mrs. Quinn's. If the boy was an inveterate smoker it was neither unnatural nor unreasonable that he would probably take all the matches left on the premises. Furthermore, when defendant was asked by Leichter if he had "borrowed any matches last night," meaning the night when the fire occurred, it should not be assumed that he lied, for, as it turned out, he told the truth. When later asked if he had not borrowed matches on Monday night he admitted he had, and said that he did so to take a bath. He did not take the bath, however, because he found he had no kindling to start a fire.

His answer to Leichter's question, as stated by Leichter, that he had not purchased any coal oil recently, without defendant's version of the conversation, is a little more difficult to explain. Defendant's version is that Leichter asked him if he had any coal oil there recently—meaning on the premises. Defendant answered, "No." As between Leichter and defendant, of course, the jury had the right to believe Leichter; but the point is that the explanation made by defendant was at least not unreasonable, and was consistent with innocence, and that is the question we are now considering. The fact that he did purchase coal oil at the Apple street grocery, as he said, for the extermination of bedbugs, is not on its face unreasonable. When it is further shown that he was promoting the sale of a lamp which used coal oil, and was expecting a delivery of the lamp any day, it being past due, it cannot be said that the quantity of oil purchased was more than was necessary. We assume as a matter of common knowledge that the purchase of coal oil for one purpose or another by persons in the community is not an extraordinary occurrence. Neither should it be considered as extraordinary if two oil cans, or ordinary cans that may be used as receptacles for oil, somewhat similar in appearance, should be found somewhere in the same community at or about the same time. Furthermore, if defendant purchased the coal oil in contemplation of committing arson it does seem strange that he would purchase it at a grocery in the immediate vicinity of the home where he was residing at the time.

The conflict between the witness Leichter and Mrs. Quinn as to what was said at the county jail, as well as the conflict between Leichter and George Horr as to what was said at the same place, speak for themselves, and need no comment. In any event they are not conclusive, for they do not prove that defendant did not spend the night at Mrs. Quinn's. If some witness had testified that he had seen defendant after 12 o'clock away from the residence of Mrs. Quinn, or, better still, if there was any testimony whatever that he was seen in the vicinity of the Reed street residence more than a mile from Mrs. Quinn's after 12 o'clock on the night of the fire, the probative effect of the impeaching evidence would have been

more manifest, and the case against the defendant rendered well-nigh invulnerable.

As regards the testimony of the witness Holman, who testified to the effect that in November, 1921, defendant told him his furniture was old, not worth shipping to Los Angeles, and that the only way to get anything out of it was to insure it and burn it, but little need be said. The remoteness of the time, the improbability that any one contemplating a crime of that kind would reveal it beforehand to another, not an accomplice, together with the fact that the witness and defendant were not on speaking terms at the time of the trial, renders the testimony of little or no value. It may be said that the credibility of the testimony and its probative effect were questions for the jury. But, in considering whether or not a case is so close and doubtful as to render it probable that error was prejudicial, it is within the province of this court to consider the weakness of evidence which on its face is manifestly improbable.

After the review we have made of the evidence and such explanation of the circumstances as the case seems to be susceptible of, it is manifest that the case presented is exceedingly close, if not absolutely doubtful, as to the guilt of the defendant. In cases dependent upon circumstantial evidence alone to connect the accused with the commission of the crime, courts have sometimes gone a long way, in fact further, perhaps, than this court feels authorized to go, to reverse judgments of conviction because of the insufficiency of the evidence. In this connection we refer to several cases relied on by appellant some of which are arson cases in many respects similar to the case at bar. *State* v. *Albert,* 176 Iowa, 164, 157 N. W. 727; *State* v. *Korth* (on rehearing) 39 S. D. 365, 164 N. W. 93; *State* v. *McCauley,* 176 Iowa, 164, 156 N. W. 280; *State* v. *Jacobson,* 130 Minn. 347, 153 N. W. 845; *People* v. *Heep,* 302 Ill. 524, 135 N. E. 64; *Heidelberg* v. *State,* 79 Neb. 499, 113 N. W. 145; *Brown* v. *State,* 67 Tex. Cr. R. 543, 150 S. W. 436; *Landers* v. *State,* 39 Tex. Cr. R. 671, 47 S. W. 1008. A casual reading of some of these cases, which we decline to quote because of the extraordinary space already occupied in stating the case and expressing our views,

will disclose that the courts have reversed judgments on the
evidence alone, in circumstantial evidence cases, where the
evidence of guilt was at least as conclusive as it is in the in-
stant case.    This court, however, has consistently adhered
to the rule that, under the provisions of our state Constitu-
tion, if there is any evidence to sustain a judgment of convic-
tion we are powerless to interfere as far as insufficiency of
the evidence is concerned.    We may, however, consider the
weakness of the evidence in connection with the conduct of the
trial with a view of determining whether or not the defendant
under all the circumstances has had a fair trial or been de-
prived of a substantial right.    The most recent decision by
this court involving that question is the case of the *State* v.
*Woods,* 62 Utah, 397, 220 Pac. 215 (on rehearing), during
the present term of court, in which case previous decisions
are referred to and quoted.    In that case, although a capital
case in which defendant had been sentenced to suffer the ex-
treme penalty, we felt compelled to affirm the judgment not-
withstanding numerous errors were committed during the
trial of the case, for the reason that the circumstances so con-
clusively established the defendant's guilt as to satisfy the
mind of the court that, notwithstanding the errors committed,
the defendant had not been deprived of a substantial right.
In other words, we were of opinion that the competent evi-
dence in the case was so conclusive that no other or different
conclusion could have been reached by the jury without vio-
lating the obligation of their oaths and disregarding their
solemn duty.

Here we have a different situation.    As before stated, it is
a close case on the facts.    The jury might well have found
the defendant not guilty without subjecting itself to just
criticism.    It was a case in which both counsel for the state
and the court should have endeavored to see that nothing was
said or done to prejudice the minds of the jurors except such
prejudice as might naturally arise from a consideration of
the facts laid before them.

The first exception relied on by appellant was taken to a
statement made by the district attorney, in his opening ad-
dress to the jury, that he would prove that the furniture

which had been insured at $1,200 was examined by a witness, Croxford, after the fire, and that it was not worth more than $200. This was objected to by appellant's attorney, first, on the grounds that the value of the property was not involved, and, second, on the ground that it was incompetent under any circumstances. The district attorney stated it showed intent and motive. The objection was overruled.

Testimony that the value of the property was only one-sixth of the value at which defendant had it insured was undoubtedly competent to prove motive. The first reason assigned for the objection was therefore trivial, and without merit. The second reason assigned, that the evidence would be incompetent under any circumstances, has more merit. If, as stated by the district attorney, he proposed to prove the lower value by a witness who did not examine it until after the fire, its competency, on its face, would appear to be exceedingly doubtful. Just how a witness who did not examine the furniture until after it had nearly all been destroyed by the fire could prove the value of the property that had been insured was not explained in the opening address, nor is there any explanation appearing anywhere in the record. This assignment is grouped by appellant with others relating to the same subject and we will consider them also in this connection.

As before stated, the prosecution did not offer evidence of value in its evidence in chief, but on cross-examination of defendant attempted to elicit the fact that the personal property in the building was of the value of $500 or $600, and had been so stated by the defendant himself. But the defendant persisted to the last that the value was over $2,000. Upon the question of the value the witness Croxford, an insurance adjuster, was offered in rebuttal, with the statement by the district attorney that the testimony of the witness would go to the credibility of the defendant, and would show that the value of the property was not in excess of $200. The witness did not go upon the premises until two or three days after the fire. Appellant's counsel objected to the evidence on the ground that it was not proper in rebuttal, and also objected to the statement of the district attorney as to what

he expected to prove, on the ground of misconduct of counsel. The court rejected the evidence on the ground that it did not appear that the property was in the same condition that it was at the time of the fire. This ruling of the court was undoubtedly correct, and the only reason for a somewhat extended review of the question here is to emphasize the fact that the district attorney displayed less caution than he ought to have done, both in his opening statement and in the offered testimony. The evidence was clearly incompetent, and should never have been referred to or offered in the presence of the jury. It conveyed to their minds a strong, adequate motive for burning the building —an impression which may have had more or less influence upon their minds, even though the evidence was rejected. This, together with the fact that the evidence, even if it had been competent, was offered in rebuttal when it should have been offered in chief, put the defendant at a disadvantage, and was not a fair method of conducting the trial of a person charged with a felony. But we are not satisfied that this conduct on the part of the district attorney, standing alone, is sufficient to justify a reversal of the judgment. The court in his instructions to the jury, and at various stages of the trial, was reasonably careful in directing the jury not to consider evidence which had been offered and rejected.

The next assignment of error entitled to consideration is misconduct of the prosecuting attorney in his closing argument to the jury. In the course of his argument he used the following language: ''In addition to that the witness lied on the witness stand.'' This was objected to, whereupon the prosecuting attorney said, ''Well, that is my construction of it.'' He thereupon continued his argument, and said: ''The two distinct lies he made to Mr. Leichter.'' Again the defendant objected, whereupon the prosecuting attorney said, ''Two distinct untruths.'' Continuing his argument, he said: ''Taking all things into consideration, gentlemen, there is only one conclusion, and that is that Mr. Horr burned the premises for the purpose of collecting $1,200 insurance. If a man is innocent there is no need of lying upon material

facts which are within his own knowledge and just transpired a day or two prior." Again defendant's counsel interposed an objection. Finally, the prosecuting attorney in his closing argument, said to the jury: "In my experience I have seen juries bring in verdicts of guilty on less favorable testimony to the state than this has been." To this statement defendant's counsel also objected, and registered an exception. While the numerous exceptions above referred to were taken separately as the several statements were made by the state's attorney, and while in the opinion of the writer there is a substantial difference between those statements in which he charged the defendant with lying, and the last statement, in which he stated the result of other cases seen by him in his experience, we have for convenience grouped them all together, as they are all charged as misconduct of the state's attorney in his closing argument.

While the great majority of the courts hold that it is improper for counsel during the trial or in argument to the jury to characterize a witness, whether a defendant or otherwise, as a liar, or charge him with lying, yet many of the cases hold it is not reversible error, especially where the charge appears to be justified by the evidence. Many such cases have been brought to our attention in the able and comprehensive brief of the Attorney General: *Miller* v. *State*, 47 Tex. Cr. R. 329, 83 S. W. 393; *Driscoll* v. *People*, 47 Mich. 413, 11 N. W. 221; *People* v. *Wirth*, 108 Mich. 307, 66 N. W. 41; *Ball* v. *State* (Tex. Cr. App.) 78 S. W. 508; *State* v. *Brooks*, 92 Mo. 542, 5 S. W. 257, 330; *State* v. *Dale*, 88 Ga. 552, 15 S. E. 287; *Coombs* v. *State*, 75 Ind. 221; *Pollins* v. *State*, 14 Neb. 540; *Northington* v. *State*, 14 Lea (82 Tenn.) 424.

It may well be conceded that in many cases, owing to the conclusiveness of the fact that the witness did swear falsely, it should be held nonprejudicial, and therefore not reversible error; yet I am compelled to hold unqualifiedly what I believe to be the better opinion that in all cases such language, either during the taking of testimony or in the argument of counsel, is improper and repressible. Counsel in his argument to a jury is clothed with a panoply of professional privilege.

This, however, is no excuse or justification for vituperation and abuse.

In *Shed* v. *State*, 68 Tex. Cr. R. 373, 153 S. W. 125, it was said by the court:

"It was highly improper for the county attorney to state to the witness who testified in behalf of the defendant, while cross-examining him, 'Don't you know you lied when you said he told you that?' It is never proper for counsel to call a witness a liar during the trial of a case, and, if by any legitimate construction we could see wherein in this instance ·this worked an injury to defendant, we would feel inclined to reverse the case."

If it was improper to ask a witness, while under cross-examination, "Don't you know you lied when you said he told you that?" when the witness then and there had the opportunity to reply, it certainly was improper to charge the defendant here with lying in the closing address of the state's attorney, when no reply was permissible.

In *People* v. *Lieska*, 161 Mich. 630, 126 N. W. 636, appellant's counsel in the instant case quote the following from the opinion of the court:

"We are compelled to say that, from these excerpts from the testimony, it appears that the course pursued by the prosecuting attorney, and permitted by the court, was highly improper and prejudicial to the rights of the respondent. The questions asked Mary Dombrowski as to the conduct of her brother-in-law, Peter, after she had answered that she knew nothing about it, indicate an attempt on the part of the prosecuting attorney to prejudice the witness before the jury. Not only was this irrelevant and immaterial and foreign to the case, but it was highly improper. It has been repeatedly held by this court that, especially where it appears that the respondent is unpopular in the community where his trial is had, the prosecuting attorney and trial judge are under especial responsibility to conduct his trial with fairness and impartiality; and that it is reversible error for the prosecuting attorney to make unwarranted attacks upon respondent's witnesses calculated to arouse in the jury an unjust suspicion of their character and truthfulness"—citing cases.

See, also, 72 Tex. Cr. R. 45, the opinions filed in the case of *State* v. *Woods*, supra. Also *State* v. *Coyle*, 41 Utah, 320, 126 Pac. 305; *Hammock* v. *State*, 7 Ala. App. 112, 61 South. 471; *Miller* v. *State*, 162 S. W. 348, 355.

But, without deciding the question as to whether these

persistent charges of lying on the part of defendant against the repeated objections of his counsel, standing alone, constitute prejudicial error, we come now to consider the last statement to which objection was made, wherein the state's attorney said to the jury:

"In my experience I have seen juries bring in verdicts of guilty on less favorable testimony to the state than this has been."

It seems to the court, that here was a direct appeal to the jury to consider matters entirely outside the evidence in the case for the purpose of convicting the defendant. It was not the language of a mere opinion. It was the statement of a positive fact. It was a statement of what the able prosecutor had actually seen in cases of which he had personal knowledge. Coming from a public official of high standing, power, and influence, and one who was presumed to have no interest in the case other than to see that the criminal laws of the state were fairly and fearlessly enforced, in my opinion the statement was clearly calculated to influence the judgment of the jury to the prejudice of the defendant. It was a direct appeal to the jury to convict the defendant not solely upon the evidence in the case, but because other juries in other cases had brought in verdicts of guilty on testimony less favorable to the state. It was, in effect, as much as to say, if you desire your verdict to be popular and well received you must convict this defendant because other juries have convicted defendants where the testimony was not as convincing. The courts in cases without number have found it their duty, not only to reprimand counsel for unfairness in their arguments to the jury, but to reverse judgments of guilty on that account. This has been done even in cases where the court cautioned the jury to disregard the statement.

In *Latham* v. *United States*, 226 Fed. 420, 141 C. C. A. 250, L. R. A. 1916D, 1118, the district attorney in his closing argument made the statement that if the train had not been late he would have had another witness to prove a certain controverted point. Objection was made by appellant. Appellant in the instant case quotes from the opinion the following pertinent language:

"Every one must realize that there are exceptional cases where, although the court does stop counsel, and does caution the jury, the impression has been made by the remarks of counsel, and although the jury honestly try to ignore that impression, it still enters into and forms a part of the verdict. In such cases the trial court should set aside the verdict on motion for a new trial. * * *

"The prosecuting officer is usually a person of considerable influence in the community, and the fact that he represents the government of the United States lends weight and importance to his utterances. He does not occupy the position of a defendant's counsel, but appears before the jury clothed in official raiment, discharging an official duty. The realization of these considerations should lead the officer to the exercise of the utmost care and caution in making statements before the jury, and should induce him to confine his arguments and statements to the testimony of the witnesses, in order that no right of the defendant is violated."

In *Tucker* v. *Henniker*, 41 N. H. 317, at page 325, the court says:

"When counsel are permitted to state facts in argument, and to comment upon them, the usage of courts regulating trials is departed from, the laws of evidence are violated, and the full benefit of trial by jury is denied. It may be said, in answer to these views, that the statements of counsel are not evidence; that the court is bound so to instruct the jury, and that they are sworn to render their verdict only according to evidence. All this is true; yet the necessary effect is to bring the statements of counsel to bear upon the verdict with more or less force, according to circumstances. * * * If not evidence, then manifestly the jury have nothing to do with them, and the advocate has no right to make them. It is unreasonable to believe the jury will entirely disregard them. They may struggle to disregard them; they may think they have done so, and still be led involuntarily to shape their verdict under their influence."

In *Berry* v. *State of Georgia*, 10 Ga. 511, the sixth headnote reflects the opinion of the court:

"For counsel to attempt surreptitiously to get before the jury, facts by way of supposition, which have not been proven, is highly reprehensible; and the practice should be instantly repressed by the court, without waiting to be called upon by the opposite party."

In the opinion, at page 522 of the report, the court, after stating the alleged misconduct, uses the following language:

"That the practice complained of is highly reprehensible, no one can doubt. It ought in every instance to be promptly repressed. For counsel to undertake by a side wind, to get that in as proof

which is merely conjecture, and thus to work a prejudice in the minds of the jury, cannot be tolerated. Nor ought the presiding judge to wait until he is called on to interpose."

See, also, *People* v. *Dane,* 59 Mich. 550, 26 N. W. 781.

In *State* v. *Woods,* supra, Mr. Justice. Frick, in a concurring opinion, makes the following pertinent observation which in principle applies to the case at bar:

"The latter (district attorney), therefore, as well as the court, should be exceedingly careful not to abuse that advantage to the prejudice of the accused. The purpose of the prosecutor should be to convict only in case the evidence establishes the guilt of the accused beyond a reasonable doubt. * * * This is especially true in cases of circumstantial evidence. The jury, which is ordinarily composed of intelligent men, will easily reconcile the evidence and give it its due weight and effect if properly guided by the court and their minds are not unduly influenced by an overzealous prosecution."

It will serve no useful purpose to cite additional cases or further discuss the questions involved. No doubt numerous cases can be cited in which analogous conduct on the part of counsel in their closing arguments has been held to be nonprejudicial to the substantial rights of the accused. This distinction, however, should be observed, were the cases close and doubtful upon the facts or were they such that the jury might with propriety have reached a different conclusion?

Our decision is based entirely upon the conclusion that the facts in this case are not sufficiently clear and satisfactory as to warrant the conclusion that the jury would not have been justified both in law and in fact in finding that the evidence was not sufficient to establish the guilt of defendant beyond a reasonable doubt. For these reasons, in view of all the matters discussed we are of opinion that the defendant did not have a fair and impartial trial, and that defendant's motion for a new trial should have been granted. Many other errors are assigned, but in our opinion they are without merit.

The judgment of the trial court is reversed, and the cause remanded, with directions to grant the defendant a new trial.

WEBER, C. J., and GIDEON and FRICK, JJ., concur.

CHERRY, J. (dissenting).  I am not able to agree to the prevailing opinion in this case, and the order reversing the judgment.  There is substantial evidence in the record supporting the following general statement of facts:  The defendant resided at Murray, Utah.  His wife died and left him with a boy 9 years old.  He had another boy 17 years old, the issue of a former marriage, who lived at Murray with his grandmother. · The defendant contemplated moving away from Murray, and in November, 1921, said to a business associate that his furniture was old and out of date and not worth freight charges to Los Angeles, and that the only way to get anything out of it was to insure it and burn it.  In April of 1922 he rented a house on Reed street, Salt Lake City, for $12 per month, moved into it, and hired Mrs. Quinn for his housekeeper.  He insured his household goods for $1,200.  In August, 1922, the housekeeper left because the defendant was financially unable .to keep her longer.  She took a house of her own, about a mile distant, where the defendant later boarded.  In the meantime defendant's older boy, on account of his grandmother's death, had come to Salt Lake City to live, bringing with him some few articles of furniture.  He took up his abode with Mrs. Quinn.  The defendant and his nine year old son remained in the Reed house until about October 6, when they arranged for board . and lodging with Mrs. Quinn.  On the same day the older son left for California.  The Reed street house, containing the insured property, was thus left uninhabited.  Articles of furniture belonging to the older son, and not covered by insurance, were removed from the Reed street house and taken to Mrs. Quinn's as late as one month before the fire.  At 2:30 o'clock a. m. of October 11, 1922, the Reed street house was discovered on fire.  Firemen broke through a front door, which was locked, and extinguished the fire.  The contents of the house had been partially destroyed.  Oil cans, rags, paper, and clothing saturated with kerosene, were scattered about the house.  The fire was plainly the work of an incendiary.  The defendant had been at the house alone on several evenings preceding the time of the fire.  Two evenings before he had borrowed matches from a neighbor, stating as

an excuse that when his boy was at home he smoked all the time, when the fact was that his boy had gone to California a few days previous, and had not lived at the house for two months. Two days before the fire he had purchased two gallons of coal oil from a nearby grocer in a can similar to one later found in the house. The defendant was present in the house alone at 9 o'clock p. m., a few hours before the fire, and the window blinds were drawn, which a nearby neighbor said was unusual. At about this time a passer-by smelled the odor of burning rags or oil in the vicinity. After the fire the defendant at first denied that he had purchased any coal oil. The following day he admitted it, and said he had bought it to kill bedbugs, etc., and had left it at his boarding place, where it disappeared, without his knowledge, and was not otherwise accounted for.

At the trial defendant denied making the statement before leaving Murray that his furniture was old and out of date, and not worth freight charges, etc., and testified that the property was worth $2,000. He offered proof by his 9 year old son and the woman with whom he boarded, that he could not have been at the place of the fire after 9 o'clock of the night of the fire. Both of these witnesses were impeached. The defendant contradicted evidence testified to by other witnesses and made more or less plausible explanations of his conduct, and asserted his innocence. There were numerous other circumstances of minor importance disclosed by the evidence. It is not necessary to refer to them.

The jury saw the witnesses, heard them testify, and found a verdict of guilty. The trial judge, who also heard the evidence, refused a new trial. As a matter of law it is not said, and cannot be said, that the evidence is insufficient to sustain the verdict. Whether the case is doubtful or close upon the evidence depends entirely upon the credence given to the testimony of the defendant. If he told the truth, he was not guilty. If he testified falsely, the jury was justified in finding him guilty. The verdict is conclusive that the jury did not believe the evidence of the defendant. That they were the exclusive judges of the matter and acted within their rights cannot be denied. The superior advantage of the trial

judge and jury in determining facts is the basis for the familiar and well-settled rule that their conclusions on such questions are final. In classic form Judge Lamm, of Missouri, thus states the reasons for the rule:

"Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last record. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or the lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching or overeagerness of the swift witness, as well as the honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it nisi believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify."

In the face of the concession that the evidence is legally sufficient to sustain the verdict, and knowing that the jury by their verdict expressed a conviction beyond a reasonable doubt, I cannot see the propriety of this court saying that the case is doubtful upon the evidence, when the jury and the trial judge, with their superior advantages, said there was no uncertainty or doubt.

With respect to the supposed errors referred to in the prevailing opinion, it seems clear that the record is such that they are not reviewable on this appeal. The transcript shows the following:

"Mr. King: The district attorney, in the course of his argument, made the statement that, 'in addition to that, the defendant lied upon the witness stand.' I except to that as misconduct on his part.

"Mr. Hutchinson: Well, that is my construction of it.

"Argument by Mr. Hutchinson, on behalf of the state, continued, in the course of which he said: 'Then the two distinct lies that he made to Herbert Leichter.'

"Mr. King: I except to that statement again.

"Mr. Hutchinson: Two distinct untruths—

"Mr. King: I make the same exception to the statement of the district attorney.

"Mr. Hutchinson (continuing argument):—that he stated to Mr. Leichter. Taking all those things into consideration, gentlemen, there is only one conclusion, that Mr. Horr burned these premises for the purpose of collecting $1,200 insurance. If a man is innocent there is no need of lying upon material facts which are within his own knowledge, and just transpired a day or two prior.

"Mr. Tobin: I except to that—that if a man is innocent there is no need of lying about material facts—as misconduct on the part of the district attorney.

"Closing argument by Mr. Hutchinson for the state: in the course of which the following statement was made: 'In my experience I have seen juries bring in verdicts of "Guilty" on less favorable testimony to the state than this has been.'

"Mr. King: I except to that statement as misconduct of counsel; that jurors brought in verdicts of 'Guilty' on less testimony."

In the case of *State* v. *Woods*, 62 Utah, ——, 220 Pac. 215, this court, in accordance with well-established principles, said:

"During the closing argument of the district attorney, he made a number of statements which were objected to by the defense. With some slight variations the objection interposed by counsel in each instance was, 'I object to the remarks of the district attorney and assign it as prejudicial error,' or 'I except to the remarks of counsel and assign it as prejudicial error.' This sort of objection * * * without a proper request for instructions to the jury and a ruling by the court, and an exception reserved at the proper time, presents nothing for review on appeal."

The Attorney General invokes this rule, and says the alleged misconduct of the district attorney is not properly before this court for review. I do not know of any good answer to his argument. But, assuming that under the state of the record the alleged errors may be reviewed, I cannot agree to the proposition that it is error for a prosecuting attorney to say in argument to the jury that a witness has lied, when his statement is based on evidence. To call a witness a liar during his examination is objectionable for obvious reasons which do not apply to such a charge made in argument. In argument before the jury greater latitude is allowed in criticizing the credibility and character of witnesses than is permissible on examination. This distinction is well defined and recognized. But when there is fair sup-

Appeal from Third District

port in the evidence for charging that defendant lied, as there is in the case at bar, the making of the charge in argument is not error, and it is not even improper. An annotation on the whole subject is contained in 4 A. L. R. 414, where many cases are collected and classified. I refer to two recent cases directly upon the point under consideration.

In *Fishleigh* v. *Detroit United Ry.*, 205 Mich. 145, 171 N. W. 549, it was said in argument concerning a witness that he sat on the witness stand "perspiring with the perspiration of perjury," and the court reviewing the conduct on appeal said:

"It becomes necessary for us, in considering this question under the rule heretofore announced, to consider the testimony in the case for the purpose of ascertaining whether the argument was clearly unwarranted. If warranted by the record counsel had the right to make it. If a witness for the plaintiff testifies to a state of facts, and a witness for the defendant testifies to an exactly opposite state of facts, and it is upon a subject that there is no reason to say there may be an honest mistake, it is patent that one of the witnesses is not testifying truthfully; and under these circumstances each counsel has the right to argue to the jury that his witness is the truthful one and the other the untruthful one. If in the instant case the record discloses such conflict between the testimony of this witness and that of other witnesses as that the jury in reaching their conclusion would be reasonably required to accept the version of one side, and reject that of the other, it was certainly proper for counsel to insist that his witnesses were truthful and the other untruthful. And we cannot determine for him the form of expression he may use. It is attacks upon witnesses that were unwarranted by the record that this court has condemned. We are not to determine when considering this question which of the witnesses speaks the truth; we do not see them, know nothing of their appearance or their manner of giving testimony; our province is only to determine whether the attack is unwarranted, whether there is anything in the record from which it may be said that counsel had no basis for the argument, and that it was without justification. * * * We think there was such a conflict between the testimony of this witness and that of others called in the case that we cannot say that the language of counsel was clearly unwarranted and without justification."

In *People* v. *Dear*, 286 Ill. 142, 121 N. E. 615, the court said:

"It is within the scope of a proper and fair argument to ae-

nounce a defendant as guilty of the crime charged and a witness as guilty of perjury where an inference of such guilt may be fairly inferred from the facts and circumstances shown by the evidence."

The trial of a person accused of crime is not a pleasing or agreeable proceeding. The subject-matter of investigation is usually base and ugly. Cunning, deceit, and falsehood are frequently encountered and have to be dealt with. If not exposed and overcome, justice fails. The amenities and refinements of polite assemblages cannot, from the nature of the situation, be observed. The occasion calls for plain speaking and the use of direct terms. It is said that the prosecutor has a privilege which he should not abuse. This is fully conceded, but if he cannot call a spade a spade he has no privilege. He does not violate his privilege unless he indulges in vituperation or insult, or makes accusations or insinuations for which there is no support in the evidence.

If the language used by the district attorney was justified and free from legal objection, as I think it was, it cannot be used to support or aggravate any other alleged error, which, without extraneous aid, is insufficient to justify the setting aside a verdict and judgment.

The further statement made by the district attorney that ''In my experience I have seen juries bring in verdicts of guilty on less favorable testimony to the state than this has been'' is, I think, too slight a ground upon which to set aside a verdict and grant a new trial. It is, in terms, a statement of a fact, but in essence only an opinion of the prosecutor. It was not an attempt ''by a side wind'' to get any fact not in evidence before the jury. I suppose it would have been legitimate argument for the prosecutor to have said, ''In human experience men act upon less evidence than this in the graver and more important affairs of life;'' but there is no substantial difference in the two statements.

It certainly cannot be said absolutely that the statement of a fact in argument which is not in evidence is error. In argument it is legitimate and common to employ comparisons and contrasts, illustrations and anecdotes, drawn from human knowledge and experience, and necessarily resting on extraneous facts. The purpose and intent of the law in this re-

spect is to prevent the introduction by unfair means of facts relating to the merits of the controversy or to the parties or their witnesses. Whether or not the statement of a fact not in evidence exceeds the wide limits of fair debate, depends upon the nature of the fact stated and its natural and probable effect. If it relates to a pertinent or controverted fact, and is calculated to serve the office of evidence, and its natural and probable effect is to influence the decision of a question of fact, it is in violation of the rule. For an attorney to say, as in *Latham* v. *U. S.*, 226 Fed. 420, 141 C. C. A. 250, L. R. A. 1916D, 1118, that if the train had not been late he would have had another witness to prove a certain controverted point, or, as in *Berry* v. *State*, 10 Ga. 511, to insinuate that an accomplice who was not sworn as a witness had corroborated the evidence of defendant's guilt, are examples of cases which violate the rule, although the conviction in the latter case was affirmed, notwithstanding the error. But the statement made in the case at bar is not in that class at all. To say that other juries in other cases had found verdicts on less evidence is not furnishing any new or additional evidence of defendant's guilt. It is only an estimation of the sum of the evidence and its effect. What the evidence was in the other cases referred to was not stated, and the remark of the district attorney amounted to no more than that in his judgment the evidence was sufficient, according to ordinary standards, to justify a conviction.

The correct rule is stated in *Cross* v. *State*, 68 Ala. 484, as follows:

"It is only when the statement is of a substantive, outside fact—stated as fact—and which manifestly bears on a material inquiry before the jury, that the court can interfere, and arrest discussion."

The limit to which the rule is applied is indicated in *State* v. *Busse,* 127 Iowa, 318, 100 N. W. 536, where the court said:

"In the closing argument for the state counsel called the jury's attention to the facts developed upon the trial of murder cases elsewhere. He related a case where a minister had brutally murdered his wife. This was apparently in answer to the argument of the appellant's counsel that because the appellant was a member of the church he could not be guilty. Again, he related the circumstances of the murder of one friend by another for the purpose of securing

a pair of shoes, and commented upon the depravity of the murderer. We see nothing in the argument relating to these two cases calling for censure even."

Comp. Laws Utah 1917, § 9231, provides:

"After hearing an appeal, the court must give judgment without regard to errors or defects which have not resulted in a miscarriage of justice. If error has been committed it shall not be presumed to have resulted in a miscarriage of justice. The court must be satisfied that it has that effect before it is warranted in reversing the judgment."

I cannot reconcile the prevailing opinion with this statute. Within the rule of the statute, to warrant a reversal of the judgment, it must be said that we are satisfied that the statement of the district attorney resulted in a verdict which would otherwise not have been rendered and thereby produced a miscarriage of justice. That is an impeachment of the jury too severe to be made upon this record. The jury were carefully instructed not to "consider nor be influenced by any statements of counsel or the court as to what the evidence is unless they state it correctly, nor by any statements as to facts which are not shown by the evidence," and "to consider all of the evidence fairly, impartially and conscientiously," and "to arrive at your verdict solely upon the evidence adduced before you at the trial." I think the record supports the conclusion that the jury obeyed the instructions of the court, and found their verdict upon the evidence which was sufficient and satisfactory. I am not "satisfied" that the statement of the district attorney resulted in a miscarriage of justice.

The judgment should be affirmed.